**KIRKPATRICK & LOCKHART LLP**
One Newark Center, Tenth Floor
Newark, NJ 07102
(973) 848-4000
*Counsel for Innovative Routines International, Inc.*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | | |
|---|---|---|
| **SYNCSORT INCORPORATED,** | : | **Civil Action No. 04-3623** |
| | : | |
| **Plaintiff,** | : | **Judge Walls** |
| | : | |
| ***vs.*** | : | |
| | : | **ANSWER, AFFIRMATIVE DEFENSES AND COUNTERCLAIM** |
| **INNOVATIVE ROUTINES INTERNATIONAL, INC.,** | : | |
| | : | |
| **Defendant.** | : | |

Innovative Routines International, Inc. ("IRI"), offers the following answer, affirmative defenses and counterclaim.

1. Admitted in part and denied in part. The allegations regarding IRI's incorporation and principal place of business are admitted. Despite diligent inquiry, IRI is without sufficient information to respond to the remaining allegations of this paragraph and, so, they are denied.

2. The allegations of this paragraph constitute legal conclusions to which no response is required. To the extent the allegations of this paragraph may be construed to assert facts, they are denied.

3. It is admitted that Syncsort is a developer and vendor of sorting software and that one Syncsort product is designed for the UNIX family of operating systems. Despite diligent inquiry, IRI is without sufficient information to respond to the remaining allegations of this paragraph and, so, they are denied.

4. Admitted.

5. Despite diligent inquiry, IRI is without sufficient information to respond to the allegations of this paragraph and, so, they are denied.

6. The allegation that any particular information or materials are eligible for protection as trade secrets constitutes a conclusion of law to which no response is required. To the extent those allegations may be construed to assert facts, they are denied. It is specifically denied that Syncsort has taken "all measures necessary to ensure the confidentiality of the Information . . ." Despite diligent inquiry, IRI is without sufficient information to respond to the remaining allegations of this paragraph and, so, they are denied.

7. Despite diligent inquiry, IRI is without sufficient information to respond to the allegations of this paragraph and, so, they are denied.

8. Despite diligent inquiry, IRI is without sufficient information to respond to the allegations of this paragraph and, so, they are denied.

9. Denied. To the contrary, IRI has not at any time knowingly come into possession of any trade secret information of Syncsort regarding any Syncsort product. The allegation regarding "the ability to access" is inherently vague. However, to the extent it suggests that IRI in fact knowingly gained access to trade secrets of Syncsort, it is denied.

By way of further answer, Syncsort made this allegation in a letter to IRI dated July 13, 2004. A copy of that July 13, 2004, letter is attached at Tab "A." By letter from counsel dated July 16, 2004, IRI responded to some of the assertions of that letter and promised a more detailed response no later than July 30, 2004. A copy of that July 16, 2004, letter is attached at Tab "B." As it promised it would, IRI sent its more-detailed response letter (the "Response Letter") by overnight courier for delivery on July 30, 2004. A copy of the Response Letter is attached at Tab "C." According to the Court's

docket, although Syncsort demanded a detailed response to its allegations, it filed its complaint on July 29, 2004, despite IRI's representation that it would provide a detailed response no later than the next day. IRI incorporates by reference the contents of its July 16, 2004, letter and the Response Letter.

10. Denied. The response to Paragraph 9 is incorporated by reference. By way of further answer, IRI has never come into possession of information or materials that it knew or had reason to know constituted trade secrets of Syncsort.

11. Denied. The responses to Paragraphs 9 and 10 are incorporated by reference. By way of further answer, IRI has never "reverse engineered" any product of Syncsort (or of any other company or individual).

12. Denied. The responses to Paragraphs 9-11 are incorporated by reference. By way of further answer, IRI has never obtained or examined any trade secret information of Syncsort.

13. Denied. The responses to Paragraphs 9-12 are incorporated by reference.

14. Denied. The responses to Paragraphs 9-13 are incorporated by reference.

15. Admitted.

16. Denied. By way of further answer, as IRI explained to Syncsort in the Response Letter, it is not correct that, in order for the statements on IRI's Internet web site to be correct, the designers of CoSORT 8 would have had to have had access to the SyncSort software programming interface or other trade secret information. In fact, the designers of CoSORT 8 did not gain access to the programming interface for any Syncsort product, and they did not gain access to any trade secret information of Syncsort. The marketing statements referred to in Paragraph 15 of the complaint refer to two free, standalone tools and services (around those tools) that are not inside or part of

the CoSORT 8 code. Rather, they are in a group of separate text-conversion tools that generate the corresponding keywords in CoSORT's sort-control language. In this case, SSU2CL converts only the basic and in-common user-written statements into a file for use by IRI's Sort-Control Language ("SortCL"). RESCRIPT uses SSU2SCL to stream the translated statements into SortCL for execution.

Moreover, SyncSort scripts show a different construction than SortCL. And, to give mainframe users continuity, they appear to have preserved legacy semantics. IRI's relational approach clearly separates the products. So, where this or any similar IRI tool cannot fully convert a user script, IRI writes a custom CoSORT solution, just as it has since 1978.

Finally, either with a manual or automatic conversion, the input and output scripts in question belong to the customer, and not to Syncsort or to IRI.

17. The allegations of this paragraph constitute legal conclusions to which no response is required. To the extent the allegations of this paragraph may be construed to assert facts, they are denied.

18. Admitted in part and denied in part. It is denied that any assertion on IRI's Internet web site is false or deceptive. The remaining allegations are admitted.

19. The allegations of this paragraph regarding SyncSort being a famous mark and regarding SyncSort's registration constitute legal conclusions to which no response is required. To the extent those allegations may be construed to assert facts, they are denied. It is admitted that, at some times prior to July 16, 2004, certain metatags on the IRI Internet web site included the word "SyncSort." The remaining allegations of this paragraph are denied. It is specifically denied that any inclusion of the word "SyncSort" in a metatag caused either a likelihood of confusion or dilution of any mark held by Syncsort. And it is specifically denied that IRI's past use of the metatag was in any way unlawful or improper.

20. Admitted in part and denied in part. It is admitted that, on July 16, 2004, IRI took certain steps with respect to its Internet web site in an effort to show good faith to Syncsort. It is denied that IRI took any of those steps because it believed them necessary to correct any improper or unlawful conduct on its part. Specifically, IRI removed metatags that included the word "SyncSort," and IRI removed the marketing references to the product described in Paragraph 16 of this answer. IRI does not intend at any time in the future to use the word "SyncSort" in a metatag associated with the IRI web site. IRI is entitled to refer to Syncsort products in its marketing.

**COUNT ONE (MISAPPROPRIATION OF TRADE SECRETS)**

21. IRI incorporates by reference the preceding paragraphs of this answer.

22. The allegations of this paragraph constitute legal conclusions to which no response is required. To the extent the allegations of this paragraph may be construed to assert facts, they are denied. It is specifically denied that IRI reverse engineered any product of Syncsort or that IRI used Syncsort's software programming interface and internal operation information in the process of developing CoSORT.

23. Denied.

24. Denied.

25. Denied.

**COUNT TWO (COPYRIGHT INFRINGEMENT)**

26. IRI incorporates by reference the preceding paragraphs of this answer.

27. The allegations of this paragraph constitute legal conclusions to which no response is required. To the extent the allegations of this paragraph may be construed to assert facts, they are denied.

28. Despite diligent inquiry, IRI is without sufficient information to respond to the allegations of this paragraph and, so, they are denied.

29. Denied.

30. The allegations of this paragraph constitute legal conclusions to which no response is required. To the extent the allegations of this paragraph may be construed to assert facts, they are denied.

31. The allegations of this paragraph regarding infringement constitute legal conclusions to which no response is required. To the extent those allegations may be construed to assert facts, they are denied. The remaining allegations of this paragraph are denied.

32. The allegations of this paragraph regarding infringement constitute legal conclusions to which no response is required. To the extent those allegations may be construed to assert facts, they are denied. The remaining allegations of this paragraph are denied.

33. Denied. The paragraph is vague and inherently confusing. To the extent the word "activities" refers to those matters described elsewhere in the complaint, it is denied that any action of IRI has been unlawful or that any action of IRI has been in contravention of Syncsort's legal rights. It is denied that Syncsort has been damaged, irreparably or otherwise, by any improper or unlawful activity of IRI, and it is denied that IRI will engage in improper or unlawful activities in the future. To the extent "activities" refers to IRI's legitimate, lawful and proper activities in competing in the marketplace, IRI will and has the right to continue those efforts.

34. The allegations of this paragraph constitute legal conclusions to which no response is required. To the extent the allegations of this paragraph may be construed to assert facts, they are denied.

**COUNT THREE (BREACH OF LICENSING AGREEMENT)**

35. IRI incorporates by reference the preceding paragraphs of this answer.

36. The allegations of this paragraph constitute legal conclusions to which no response is required. To the extent the allegations of this paragraph may be construed to assert facts, they are denied.

37. The allegations of this paragraph constitute legal conclusions to which no response is required. To the extent the allegations of this paragraph may be construed to assert facts, they are denied.

38. The allegations of this paragraph constitute legal conclusions to which no response is required. To the extent the allegations of this paragraph may be construed to assert facts, they are denied.

39. Denied. There is (or was) no contract between IRI and Syncsort, express or otherwise. IRI is therefore not in breach of any contract with Syncsort, no damages claimed by Syncsort could be the result of any breach of contract by IRI.

40. Denied. The paragraph is vague and inherently confusing. To the extent the word "activities" refers to those matters described elsewhere in the complaint, it is denied that any action of IRI has been unlawful or that any action of IRI has been in contravention of Syncsort's legal rights. It is denied that Syncsort has been damaged, irreparably or otherwise, by any improper or unlawful activity of IRI, and it is denied that IRI will engage in improper or unlawful activities in the future. To the extent "activities"

refers to IRI's legitimate, lawful and proper activities in competing in the marketplace, IRI will and has the right to continue those efforts.

41. The allegations of this paragraph constitute legal conclusions to which no response is required. To the extent the allegations of this paragraph may be construed to assert facts, they are denied.

**COUNT FOUR (FALSE ADVERTISING)**

42. IRI incorporates by reference the preceding paragraphs of this answer.

43. It is admitted that IRI's Internet web site advertises certain products and services, and that it does so in interstate commerce. The remaining allegations of this paragraph are denied. By way of further response, the representations on IRI's Internet web site referred to in the complaint are accurate.

44. The allegations of this paragraph constitute legal conclusions to which no response is required. To the extent the allegations of this paragraph may be construed to assert facts, they are denied.

45. Denied.

46. Denied.

47. The allegations of this paragraph constitute legal conclusions to which no response is required. To the extent the allegations of this paragraph may be construed to assert facts, they are denied.

**COUNT FIVE (TRADEMARK INFRINGEMENT AND DILUTION)**

48. IRI incorporates by reference the preceding paragraphs of this answer.

49. The allegations of this paragraph constitute legal conclusions to which no response is required. To the extent the allegations of this paragraph may be construed to assert facts, they are denied.

50. The allegations of this paragraph constitute legal conclusions to which no response is required. To the extent the allegations of this paragraph may be construed to assert facts, they are denied. By way of further answer, no action by IRI has created any likelihood of confusion in the marketplace or any dilution of any trademark held by Syncsort.

51. The allegations of this paragraph regarding available remedies constitute legal conclusions to which no response is required. To the extent those allegations may be construed to assert facts, they are denied. The remaining allegations of this paragraph are denied.

52. Denied.

53. Denied.

54. The allegations of this paragraph constitute legal conclusions to which no response is required. To the extent the allegations of this paragraph may be construed to assert facts, they are denied.

**COUNT SIX (UNFAIR COMPETITION)**

55. IRI incorporates by reference the preceding paragraphs of this answer.

56. The allegations of this paragraph constitute legal conclusions to which no response is required. To the extent the allegations of this paragraph may be construed to assert facts, they are denied.

57. Denied.

58. Denied.

59. The allegations of this paragraph constitute legal conclusions to which no response is required. To the extent the allegations of this paragraph may be construed to assert facts, they are denied.

Therefore, the Court should dismiss the complaint and award to Defendant its fees and costs in defending this matter along with such other relief as the Court deems just.

## AFFIRMATIVE DEFENSES

1. The complaint, or some portion of it, fails to state a claim for which relief may be granted.

2. Plaintiff lacks standing to assert some or all of its claims.

3. Some or all of the claims are barred by laches or the applicable statute of limitations.

4. Some or all of the claims are barred by the Plaintiff's unclean hands.

5. Some of all of the claims are moot.

6. Plaintiff has waived some or all of its claims.

7. Plaintiff is estopped from asserting some or all of its claims.

8. Some or all of the uses described or alleged constitute fair use under the applicable statutes.

9. Some or all of the claims in the complaint are barred by Plaintiff's improper use of copyright or trademark.

## COUNTERCLAIMS

1. IRI incorporates by reference its foregoing answer.

2. This Court has jurisdiction over these counterclaims under 28 U.S.C. §§ 1331, 1332, 1338 and 1367. Venue over these counterclaims is proper to the extent it is proper over Plaintiff's claims.

**COUNT I**
**(ANTITRUST, 15 U.S.C. § 2)**

3. IRI incorporates by reference the assertions in the foregoing paragraphs of the counterclaims as well as its foregoing answer.

4. Syncsort's conduct, as described in this counterclaim, was in interstate commerce.

5. As detailed below, Syncsort has engaged in predatory and anticompetitive conduct.

a. On information and belief, Syncsort has sold its UNIX software product below Syncsort's costs to produce the product in order to entice consumers to purchase the Syncsort UNIX software product and thereby enter into multi-year licensing agreements that would preclude those consumers from then switching to the UNIX software product of one of Syncsort's competitors, most particularly IRI.

b. On information and belief, Syncsort has induced consumers who were negotiating to purchase IRI's UNIX software product to reveal to Syncsort IRI's pricing and quotation information so that Syncsort could then undersell IRI with that consumer. In such cases, the consumers who were so induced were subject to non-disclosure agreements that precluded their providing that pricing and quotation information to Syncsort.

c. On information and belief, on at least one occasion, in order to eliminate IRI as a competitor with respect to a particular customer that had made a tentative agreement with IRI, Syncsort offered to provide to the customer a free copy of

Syncsort's product and to pay off any debt the customer might have had to IRI with respect to the customer's tentative agreement with IRI.

d. On information and belief, Syncsort seeks to leverage its position as a virtual monopolist in the mainframe sort market to obtain a similar monopoly in the UNIX sort market.

i. On information and belief, and based on its own representations, Syncsort holds a monopoly position with respect to sales of sort software for the mainframe platform throughout the United States and the world (the relevant product market being mainframe sort software and the relevant geographic market being the United States (or, potentially, the world)).

ii. On information and belief, in at least two circumstances (and likely significantly more), Syncsort has leveraged its monopoly role with respect to mainframe sort software in an attempt to eliminate competition (including, but not limited to IRI) from the UNIX sort software market.

iii. On information and belief, Syncsort has done this by means of manipulating the price it charges customers in the mainframe sort software market to force or entice those customers to then buy Syncsort's UNIX sort software (and be locked into Syncsort's multi-year license agreement).

e. Syncsort has filed this lawsuit, which constitutes "sham" litigation for the following non-exhaustive list of reasons:

i. The claims Syncsort has asserted in its complaint are objectively baseless in that no reasonable litigant could realistically expect success on the merits of those claims.

ii. Syncsort has made factual or legal allegations in its complaint for which it has no good-faith or objectively reasonable basis. By way of illustration, and without limitation:

A. Syncsort alleges that IRI "reversed engineered SyncSort UNIX in order to investigate its methods of operation." *See* Complaint at ¶ 11. Syncsort had no good-faith reason to believe such reverse engineering occurred, and it could not have conducted a reasonable investigation before making that allegation because there are no facts that would substantiate such an allegation. As noted above, IRI has never reverse-engineered any product of Syncsort (or any other individual or entity).

B. Syncsort alleges that "the developers of CoSort Version 8 would have needed to have had access to the SyncSort software programming interface or other trade secret information." *See* Complaint at ¶ 16. Syncsort alleges that IRI "used SyncSort's software programming interface and internal operation information in the process of developing a competing product, CoSORT Version 8." *See* Complaint at ¶ 22. Syncsort had no good-faith reason to believe that IRI had access to the SyncSort software programming interface, internal operation information or "other trade secret information," and it could not have conducted a reasonable investigation before making that allegation because there are no facts that would substantiate such an allegation.

C. Syncsort alleges that IRI violated federal trademark law because, for some period of time in the past, IRI's Internet web site included in a metatag the word "SyncSort." Under applicable law, in the context in which that metatag reference appeared, there could be no trademark infringement and no reasonable litigant could have believed such a trademark claim could prevail. Moreover, Syncsort could have no good-faith basis to believe that the presence of the metatag reference caused any harm to Syncsort. Further, by the time it filed this lawsuit, Syncsort knew that IRI had removed the metatag references.

D. Syncsort alleges that IRI "executed (and as a consequence reproduced) the SyncSort software without a license agreement in connection with developing CoSORT Version 8." *See* Complaint at ¶ 29. In fact, IRI did not execute or reproduce SyncSort software in connection with the development of CoSORT 8. Syncsort had no good-faith reason to believe that IRI executed or reproduced Syncsort software in connection with the development of CoSORT 8., and it could not have conducted a reasonable investigation before making that allegation because there are no facts that would substantiate such an allegation.

iii. Syncsort initiated this lawsuit not for the purpose of seeking and ultimately obtaining any proper remedy due to it under the law but for purposes of directly interfering with the business relationships of a competitor and forcing a direct and legitimate business competitor from the market.

A. As noted above, by letter of July 13, 2004, Syncsort wrote to IRI and made essentially all of the allegations included in the complaint in this case (with the exception of the allegation of reverse engineering). Syncsort demanded a response within five days. (Tab "A")

B. By letter dated July 16, 2004, IRI promptly responded that it took seriously the allegations Syncsort made, but that five days was an insufficient time to prepare a meaningful response to a technical and lengthy letter, and that IRI would provide a full response no later than the end of the month (in other words, 12 calendar days later than Syncsort's letter demanded). (Tab "B") IRI's counsel faxed and mailed the July 16, 2004, letter to Syncsort's counsel. Syncsort's counsel received that letter, a fact made plain by the quotation from the letter in Syncsort's complaint. *See* Complaint at ¶ 20.

C. Syncsort at no time indicated that such a modest extension of time would be unacceptable.

D. As it promised it would, by letter of July 29, 2004, transmitted by overnight mail, IRI provided a comprehensive response to Syncsort's July 13, 2004, letter. (Tab "C") The Response Letter addressed each issue in Syncsort's July 13, 2004, letter and explained that Syncsort's allegations were either unfounded or based on its misunderstanding of IRI's products or representations made on IRI's Internet web site. *See* Response Letter. The Response Letter is incorporated here by reference.

E. Despite its demand for a response and despite its tacit agreement that the response could be provided by July 30, 2004, Syncsort filed this lawsuit at the close of business on July 29, 2004 (according to the Court's date stamp).

F. Syncsort's premature filing of its complaint demonstrates that it had no interest in the facts or in IRI's clarification of the issues, and that Syncsort intended to file its complaint regardless of the accuracy of Syncsort's allegations.

G. The additional fact that Syncsort has failed to withdraw or to amend its complaint in light of IRI's Response Letter further demonstrates that Syncsort's motive in initiating this litigation lawsuit was not for the purpose of seeking and ultimately obtaining any proper remedy due to it under the law but for purposes of directly interfering with the business relationships of a competitor and forcing a direct and legitimate business competitor from the market.

H. Notably, Syncsort did not include in its July 13, 2004, letter to IRI any reference to "reverse engineering" and did not, therefore, afford IRI the opportunity to explain and demonstrate that it did not reverse engineer any Syncsort product.

I. On information and belief, among Syncsort's true motives in bringing this lawsuit is its desire to prevent IRI from offering a competing product at least during the pendency of this litigation so that Syncsort can lock in customers to additional, years-long license agreements at prices higher than those licenses would be were there a vigorous and competitive market.

J. While IRI sells its UNIX sort product with a perpetual license, Syncsort sells its competing product with a limited term and a built-in timer so that, when the license expires, the software ceases to operate.

K. Thus, Syncsort customers have a limited "window of opportunity" to switch products as they approach the end of their license term with Syncsort; if they want to but cannot switch within that "window," Syncsort's process forces them to renew the Syncsort license lest the existing Syncsort software simply cease to work.

6. On information and belief, Syncsort has engaged in such predatory and anticompetitive conduct with the specific intent to monopolize the relevant market described in Paragraph 8 below.

7. For the following reasons, there is a dangerous probability that, unless corrected, Syncsort's predatory and anticompetitive conduct will result in Syncsort's achieving monopoly power in the relevant market described in Paragraph 8 below:

a. There are fewer than a half dozen companies left that sell sorting software for the UNIX operating system.

b. Of those, only Syncsort and IRI offer products with sufficient speed, functionality, third-party product interfacing, and international representation that can properly serve the needs of the majority of corporate and government consumers of such software.

c. On information and belief, most consumers who require a robust sorting application for the UNIX operating system understand their only choices to be the products of Syncsort or IRI.

d. Syncsort and IRI are the only UNIX sort vendors that routinely appear and market their products at industry trade shows at which consumers consider what product to purchase.

e. On information and belief, IRI and Syncsort sales of UNIX sort software together comprise the vast majority of sales in the relevant market described in Paragraph 8 below.

f. On information and belief, there are no persons or business entities that will at any time in the foreseeable future enter the relevant market as described in Paragraph 8 below.

g. If Syncsort is permitted to continue the improper and unlawful conduct described in this counterclaim, the result would be to lessen or eliminate IRI as its primary (and only seriously viable) competitor, just as Syncsort has sought to accomplish in litigation with other potential competitors that Syncsort has now driven from the marketplace.

h. If Syncsort were able, through the improper and unlawful conduct described in this counterclaim, to lessen competition against its product in the relevant market described in Paragraph 8 below, Syncsort would then have essentially no meaningful and viable competitors in that market, and consumers would be deprived of any real choice among UNIX sort software products.

8. For purposes of this counterclaim, the relevant market is as follows:

a. The relevant product market is sort software for the UNIX operating system. While there are sort programs available for other operating systems,

they are not interchangeable with sort programs for the UNIX operating system. This is because consumer databases and related applications cannot be readily moved to non-UNIX platforms simply to leverage another sort product.

b. The relevant geographic market is the entire United States (as well as overseas markets) because both Syncsort and IRI sell or seek to sell their competing UNIX products to a nationwide and worldwide group of customers and potential customers.

9. Through its predatory and anticompetitive practices, including but not limited to those described above, Syncsort is attempting intentionally to monopolize the relevant product and geographic markets described above.

10. Rather than competing by designing, producing and selling a superior product, Syncsort has instead attempted to monopolize the market by improper and unlawful actions. For example, by filing this sham lawsuit, Syncsort is causing to IRI the damages described below but, perhaps more important, Syncsort threatens improperly to destroy the robust competition in the relevant markets from which customers and the public benefit through better products and support and through better pricing.

11. As a direct and proximate result of Syncsort's conduct as described in this counterclaim, IRI has suffered or will suffer damages including, but not limited to, the following:

a. lost sales or sales opportunities for its products; and

b. expenses related to defending against this litigation including, among other things, counsel fees and costs.

WHEREFORE, Innovative Routines International, Inc., demands compensatory damages, treble damages, legal fees and such other relief as the Court deems just.

**COUNT II**
**(FALSE ADVERTISING, 15 U.S.C. § 1125(A))**

12. IRI incorporates by reference the assertions in the foregoing paragraphs of the counterclaims as well as its foregoing answer.

13. On its Internet web site and in printed matter distributed in interstate commerce, Syncsort has advertised that "SyncSort is the fastest sort on UNIX;" that ". . . Syncsort is the fastest and most efficient product on every platform;" that Syncsort was the 'only UNIX sort designed for high performance;' and that "patented technologies such as parallel processing . . . ." Syncsort also uses a misleading comparison chart to compare its UNIX sort product to "Other sort methods" on UNIX, misleading readers to believe IRI's CoSORT either does not exist, or that CoSORT consistently does not perform as well as Syncsort's UNIX product. Copies of these statements are attached at Tab "D."

14. The published statements referred to in the previous paragraph are, at a minimum, false, deceptive and misleading.

15. In publications, Syncsort and its agents have represented that consumers or departments of large corporate consumers had agreed to license Syncsort's UNIX product. A copy of one such publication is attached at Tab "E."

16. In fact, those consumers or departments of large corporate consumers had not agreed to license Syncsort's UNIX product, and Syncsort's false statement was deceptive and misleading.

17. On information and belief, Syncsort has orally represented to consumers that IRI's product either did not exist in the marketplace or Syncsort has orally made false and misleading comments about IRI's product to prospective consumers.

18. Syncsort's false statements deceived or had a strong likelihood of deceiving their intended audience.

19. Syncsort's false statements are material in that they are likely to influence purchasing decisions.

20. As a result of Syncsort's conduct as described in this count, IRI has suffered damages including, but not limited to, lost sales.

WHEREFORE, Innovative Routines International, Inc., demands compensatory damages, legal fees and such other relief as the applicable statute allows or that the Court deems just.

**COUNT III**
**(COPYRIGHT INFRINGEMENT)**

21. IRI incorporates by reference the assertions in the foregoing paragraphs of the counterclaims as well as its foregoing answer.

22. IRI is the owner of copyrights that exist in copyrightable parts of the CoSORT software.

23. IRI has registered versions of CoSORT; others are deemed registered as derivative works.

24. In particular, IRI first introduced the /command syntax of CoSORT's sort control language to the UNIX market with its copyrighted 2.5 release in 1992. In 1993, Syncsort released version 1.0 of its UNIX product with substantially similar /command syntax. On information and belief, Syncsort obtained a copy of CoSORT 2.5 for the purposes of such study and possible reverse engineering before releasing its first UNIX release, seven years after IRI introduced commercial sort software to the UNIX market.

25. IRI has placed appropriate notices of copyright on all versions of CoSORT software and related documentary materials.

26. IRI has used non-disclosure agreements and appropriately phrased license agreements to protect the confidentiality of its copyright and common-law protected information.

27. On information and belief, at some time after IRI published various versions of CoSORT that are the subject of IRI's copyrights, Syncsort reproduced certain of the copyrighted facets of CoSORT to use for Syncsort's use, particularly to add features to its UNIX sorting software for sale to the public after IRI had released and copyrighted many of those features and sort control language terms through its derivative rights and prominent copyright statements.

28. Syncsort had no license, permission or privilege to copy IRI's protected materials, and Syncsort's copying actions constitute an infringement of one of more copyrights owned by IRI.

29. By reason of its infringement as described above, Syncsort has been enriched by profits and otherwise, and IRI has been harmed both irreparably and monetarily by Syncsort's infringement since the inception of Syncsort's sort products in the UNIX market in 1993 and continuing until today.

WHEREFORE, Innovative Routines International, Inc., demands compensatory damages including, but not limited to, its actual damages plus Syncsort's improperly obtained profits (or, in the alternative, statutory damages), an injunction barring the sale by Syncsort of any product that constitutes an infringing product, legal fees and such other relief as the Court deems just.

**COUNT IV**
**(TORTIOUS INTERFERENCE**
**WITH PROSPECTIVE ECONOMIC ADVANTAGE)**

30. IRI incorporates by reference the assertions in the foregoing paragraphs of the counterclaims as well as its foregoing answer.

31. By engaging in the conduct described in this counterclaim, Syncsort intentionally interfered with the prospect of, or reasonable expectation of, economic advantage to IRI arising from sales of IRI's product, CoSORT UNIX.

32. There is a reasonable probability that, but for Syncsort's conduct, IRI would have realized economic advantage in the form of additional sales of IRI's product, CoSORT UNIX.

33. In engaging in the conduct described above, Syncsort acted for the purpose of damaging IRI and, in doing so, acted outrageously, maliciously and with ill will.

WHEREFORE, Innovative Routines International, Inc., demands compensatory damages, punitive damages and such other relief as the Court deems just

**COUNT V**
**(TORTIOUS INTERFERENCE WITH CONTRACT)**

34. IRI incorporates by reference the assertions in the foregoing paragraphs of the counterclaims as well as its foregoing answer.

35. During its negotiations with most prospective customers, IRI asks that prospective customer to sign a non-disclosure agreement that precludes the prospective customer from revealing certain information regarding the negotiations, including the price quotations IRI has made to that customer.

36. On information and belief, on at least one occasion and likely more, Syncsort has induced prospective IRI customers to breach non-disclosure agreements those prospective customers entered into with IRI.

37. On information and belief, Syncsort induced such breaches of IRI's non-disclosure agreement in order to learn what price quotation IRI had made to its prospective customer so that Syncsort could then undersell IRI.

38. In entering into the non-disclosure agreements, IRI formed a contractual arrangement with the prospective customers in question.

39. On information and belief, Syncsort knew of the existence of IRI's non-disclosure agreement and its prohibition on disclosure of price information.

40. On information and belief, when Syncsort induced prospective IRI customers to disclose IRI's price information, Syncsort knew that those prospective customers would have to breach the IRI non-disclosure agreement in order to provide IRI's price information to Syncsort.

41. On information and belief, in inducing such breaches of IRI's non-disclosure agreement, Syncsort acted with the purpose of improperly disrupting the contractual arrangement between IRI and its prospective customers, and Syncsort acted with the purpose of improperly competing with IRI.

42. In engaging in the conduct described in this count of the counterclaim, Syncsort acted without privilege, justification or excuse.

43. As a result of Syncsort's wrongful conduct, IRI has lost sales, good will, normal growth opportunities, and suffered pecuniary injury.

WHEREFORE, Innovative Routines International, Inc., demands compensatory damages, punitive damages and such other relief as the Court deems just

**COUNT VI**
**(UNFAIR COMPETITION)**

44. IRI incorporates by reference the assertions in the foregoing paragraphs of the counterclaims as well as its foregoing answer.

45. Some or all of the conduct of Syncsort alleged in the foregoing paragraphs of this counterclaim constitute common-law unfair competition.

46. As a result of Syncsort's unfair competition, IRI has lost sales, good will, normal growth opportunities, and suffered pecuniary injury.

WHEREFORE, Innovative Routines International, Inc., demands compensatory damages, punitive damages and such other relief as the Court deems just.

IRI demands a jury trial on all claims triable by a jury.

Respectfully submitted,
**KIRKPATRICK & LOCKHART LLP**
Counsel for Defendant
Innovative Routines International, Inc.

/s/ Sherry D. Williams .
Sherry D. Williams (SDW – 0890)

*Of counsel:*

David R. Fine
Pa. Supreme Ct. No. 66742
KIRKPATRICK & LOCKHART LLP
240 North Third Street
Harrisburg, PA 17101
(717) 231-4500

Anthony H. Handal
Kirkpatrick & Lockhart LLP
599 Lexington Avenue
New York, NY 10022-6030
(212) 536-3900

August 26, 2004

**CERTIFICATE OF SERVICE**

I certify that, on August 26, 2004, I filed the attached document through the Court's electronic case filing system such that the attached document will automatically be served on counsel for the plaintiff. In addition, I certify that my colleague, David R. Fine, e-mailed a copy of this document and the accompanying exhibits to the following:

Jeff H. Galloway, Esq.
Hughes Hubbard & Reed LLP
1 Battery Park Plaza
New York, New York 10004

/s/ Sherry D. Williams .
Sherry D. Williams (SDW – 0890)