**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| SYNCSORT INC., | : | |
| | : | |
| Plaintiff, | : | **OPINION** |
| | : | |
| v. | : | Civil Action No. 04-3623 (WHW) |
| | : | |
| INNOVATIVE ROUTINES INTERNATIONAL, INC., | : | |
| | : | |
| Defendant. | : | |
| | : | |

**Walls, Senior District Judge**

Defendant Innovative Routines International, Inc. ("IRI") has moved for summary judgment on the entirety of Plaintiff Syncsort Inc.'s ("Syncsort") complaint. This motion is denied in part and granted in part. IRI has also moved to strike the expert reports and preclude the testimony of Syncsort's experts Theodore F. Martens and Roger Miligrim. These motions are denied.  Syncsort has moved for summary judgment as to IRI's counterclaims. This motion is granted. Syncsort has also moved for sanctions against IRI and its counsel, pursuant to Federal Rules of Civil Procedure 11, 26(g); 28 U.S.C. § 1927 and the Court's inherent powers. This motion is denied.

## I.    FACTUAL & PROCEDURAL BACKGROUND

This matter involves a dispute between two competitors, Syncsort and IRI, which develop and sell sorting software for computers that operate the UNIX system.  Syncsort produces and licenses a sorting software product called "SyncSort UNIX."  IRI markets a directly competing sorting product called "CoSORT."  These programs are capable of sorting data in a multitude of

**NOT FOR PUBLICATION**

ways. In order to program the software to sort data in a particular way, users write instructions in what are known as "job-control scripts." Each of these programs has a particular "scripting language" and "grammar" for writing these scripts.

Syncsort publishes the SyncSort UNIX Reference Guide (the "Reference Guide") which provides guidance on writing scripts in the SyncSort language and grammar. The Reference Guide contains a confidentiality legend which states in part: "All rights reserved. This document contains proprietary and confidential material, and is only for use by lessees of the SyncSort proprietary software system." Syncsort has also created "manual pages" or "man pages" which provide a ready reference for users about scripting in the SyncSort UNIX language.

"ITtoolbox"  is a website forum for users to discuss various software applications, including SyncSort UNIX.  Users of the site have discussed how to write a script to achieve certain sorting results.  Synscort's technical support employees had also posted answers to questions about writing scripts on this site. These answers, and the answers from other users, often contain fragments of the programing language as examples of how certain tasks can be completed.

In 2000, IRI developed a product known as "SSU2SCL" which can translate basic scripts written in the SyncSort UNIX command language into the language used with CoSORT. The purpose of this tool was to allow users who had previously used the SyncSort UNIX application to use the CoSORT application for their sorting needs. CoSORT is sold with a perpetual license, whereas SyncSort UNIX is sold with a license that must be renewed every five years. The

**NOT FOR PUBLICATION**

SyncSort UNIX licensing agreement contains a provision restricting the use of the software

which contains a number of confidentiality provisions.

At some point, IRI included the word "syncsort" as a metatag[1] on its website. According

to IRI, it included the metatag because IRI offered converters for SyncSort mainframe and UNIX

parameters. This metatag has since been removed by IRI from its website.

Syncsort alleges that IRI used Syncsort's trade secret information, the SyncSort UNIX

language, to develop the SSU2SCL translator.  IRI initially claimed that it had not used any

proprietary information to develop the translator, but rather had developed the translator based on

publically available customer-written scripts.  However, it was later revealed that the IRI

developer of the translator was actually in possession of a copy of the Reference Guide obtained

from a distributor in Brazil, and may have made "limited use" of it during the development of the

convertor.

On July 29, 2004, Syncsort filed this lawsuit against IRI alleging the following: (1) trade

secret misappropriation; (2) copyright infringement;[2] (3) breach of licencing agreement; (4) false

advertising in violation of the Lanham Act, 15 U.S.C. § 1125(a)[3], (5) trademark infringement

---

[1] A metatag is "An HTML tag that contains descriptive information about a webpage and does
not appear when the webpage is displayed in a browser. A word that is in a metatag of a webpage will
cause that webpage to turn up as a result of a search engine's search on that word, even if that word is not
found in the webpage as viewed in a browser." The American Heritage Science Dictionary. HTML
(HyperText Markup Language) is the "markup language used to structure text and multimedia documents
and to set up hypertext links between documents, used extensively on the World Wide Web." Id.

[2] Syncsort has since dropped the Copyright claim.

[3] Syncsort's false advertising claim is based on the following statements made on IRI's website:
"the fastest sort software available for UNIX environments," "the world's fastest, and most widely
licensed, commercial-grade sort package for UNIX systems," "the world's first, fastest, and most widely

NOT FOR PUBLICATION

based on the inclusion of the term "syncsort" as a metatag on IRI's website; and (6) common law unfair competition. Syncsort seeks temporary, preliminary and permanent injunctive relief as well as damages and punitive damages.

In its Answer, IRI made the following counterclaims against Syncsort: (1) predatory and anti-competitive conduct in violation of 15 U.S.C. §2; (2) false and misleading advertising in violation of 15 U.S.C. 1125(A); (3) copyright infringement; (4) tortious interference with prospective economic advantage; (5) tortious interference with contract; and (6) unfair competition.[4]

This Court held an evidentiary hearing on the Syncsort's motion for preliminary injunction. Over the course of December 6, 2004, January 4, 2005, and January 5, 2005, both parties presented witness testimony.

On May 15, 2007, the parties filed the numerous motions that are currently before the Court. IRI moved to strike the reports and preclude the testimony of Syncsort's experts Theodore F. Martens and Roger M. Miligram and for summary judgment on Syncsort's complaint. Syncsort moved for summary judgment on the IRI's counterclaim and for sanctions pursuant to Rule 11. The Court heard oral argument on these motions on January 9, 2008.

---

licensed open systems sorting package and extract-transform-load (ETL) accelerator," and "the fastest (and most scalable) sort product available for the UNIX systems, period." (Complaint ¶ 18.)

[4] IRI has decided not to pursue the false advertising (Count II) or copyright infringement counterclaims (Count III). (Defs' Opp. at 2.)

NOT FOR PUBLICATION

## II.   IRI'S MOTION FOR SUMMARY JUDGMENT

### A.   Legal Standard

Summary judgment is appropriate where the moving party establishes that "there is no genuine issue as to any material fact and that [it] is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A factual dispute between the parties will not defeat a motion for summary judgment unless it is both genuine and material. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986). A factual dispute is genuine if a reasonable jury could return a verdict for the non-movant and it is material if, under the substantive law, it would affect the outcome of the suit. See id. at 248. The moving party must show that if the evidentiary material of record were reduced to admissible evidence in court, it would be insufficient to permit the non-moving party to carry its burden of proof. See Celotex Corp. v. Catrett, 477 U.S. 317, 318 (1986).

Once the moving party has carried its burden under Rule 56, "its opponent must do more than simply show that there is some metaphysical doubt as to the material facts in question." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). To survive a motion for summary judgment, a non-movant must present more than a mere scintilla of evidence in his favor.  Woloszyn v. County of Lawrence, 396 F.3d 314, 319 (3d Cir. 2005). The non-moving party must go beyond the pleadings and, by affidavits or other evidence, designate specific facts showing that there is a genuine issue for trial. Celetex, 477 U.S. at 324; Fed. R. Civ. P. 56(e).  Such affidavits must be based "on personal knowledge," establish "such facts which would be admissible," and "show affirmatively that the affiant is competent to testify in all matters stated therein." Maldonado v. Ramirez, 757 F.2d 48, 50 (3d Cir. 1985); see also J.

**NOT FOR PUBLICATION**

Moore, W. Taggerts & J. Wicker <u>Moore's Federal Practice</u> § 56.22[1] (2d ed. 1985).

"[C]onclusory statements, general denials, and factual allegations not based on personal

knowledge [are] insufficient to avoid summary judgment." <u>Olympic Junior, Inc. v. David Crystal,</u>

<u>Inc.</u>, 463 F.2d 1141, 1146 (3d Cir. 1972); <u>see also</u> <u>First Nat'l Bank of Ariz. v. Cities Serv. Co.</u>,

391 U.S. 253 (1968).

At the summary judgment stage the court's function is not to weigh the evidence and

determine the truth of the matter, but rather to determine whether there is a genuine issue for

trial. <u>See</u> <u>Anderson</u>, 477 U.S. at 249. In doing so, the court must construe the facts and inferences

in the light most favorable to the non-moving party. <u>Curley v. Klem</u>, 298 F.3d 271, 277 (3d Cir.

2002).

**B.     Analysis**

      **1.     Misappropriation of Trade Secret Claim**

            ***i.     Legal Standard***

"A trade secret claim in the federal courts is governed not by federal common law but by

state law." <u>Rohm & Haas Co. v. Adco Chem. Co.</u>, 689 F.2d 424, 429 (3d Cir. 1982).[5]  The six

basic elements of a claim of trade secret misappropriation in New Jersey are: (1) a trade secret

exists; (2) it was communicated in confidence; (3) the secret information was disclosed in breach

of that confidence; (4) the secret information was acquired by the competitor with knowledge of

---

[5] While the parties have not addressed the issue of whether New Jersey or Florida law will govern this action, both parties have cited to New Jersey law and IRI has stated that the law of the two states is similar with respect to trade secret misrepresentation claims. (Def.'s Motion at 7 n.7 (citing <u>American Red Cross v. Palm Beach Blood Bank, Inc.</u>, 143 F.3d 1407, 1410-11 (11th Cir. 1998).) As this appears to be the case, the Court will analyze the claim under New Jersey law.

**NOT FOR PUBLICATION**

the breach of confidence; (5) the secret information was used by the competitor to the detriment

of the plaintiff; and (6) the plaintiff took precautions to maintain the secrecy of the trade secret.

See Merckle GmbH v. Johnson & Johnson, 961 F. Supp. 721, 727-31 (D.N.J. 1997).

IRI is only challenging two elements of the misappropriation claim: (1) the existence of a

trade secret and (2) that Syncsort did not take precautions to maintain the secrecy of the trade

secret.  These two elements essentially rest on the same key proposition – "secrecy." See Darsyn

Labs. Inc. v. Lenox Labs., Inc., 120 F. Supp. 42, 54 (D.N.J. 1954) ("the right to protection begins

and ends with the life of secrecy.").

The party who asserts the trade secret bears the burden of proving that the information is

a secret and not a matter of general knowledge in the industry. Rohm & Haas, 689 F.2d at 431.

New Jersey has adopted the definition of trade secret provided in the Restatement of Torts:

> A trade secret may consist of any, formula, pattern, device or compilation of
> information which is used in one's business and which gives him an opportunity
> to obtain an advantage over competitors who do not know or use it.

Id. (quoting Restatement of Torts, § 757 comment b (1939)).  The New Jersey Supreme Court

has noted six supplementary considerations given in the Restatement:

> (1) the extent to which the information is known outside the business; (2) the
> extent to which it is known by employees and others involved in the business; (3)
> the extent of measures taken by the owner to guard secrecy of the information; (4)
> the value of the information to the business and to its competitors; (5) the amount
> of effort or money expended on developing the information; and (6) the ease of
> difficulty with which the information could be properly acquired or duplicated by
> others.

Ingersoll-Rand Co. v. Ciavatta, 110 N.J. 609, 637 (1988) (quoting Restatement of Torts,  §757

comment b).

NOT FOR PUBLICATION

In order to determine whether the "secrecy" of a trade secret has been maintained, the

Restatement instructs:

> Matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret. Matters which are completely disclosed by the goods which one markets cannot be his secret. Substantially, a trade secret is known only in the particular business in which it is used. It is not requisite that only the proprietor of the business know it. He may, without losing his protection, communicate it to employees involved it its use. He may likewise communicate it to others pledged to secrecy. Others may also know of it independently, as, for example, when they have discovered the process or formula by independent invention and are keeping it secret. Nevertheless, a substantial element of secrecy must exist, so that, except by the use of improper means, there would be difficulty in acquiring the information.

Merckle GmbH, 961 F. Supp. at 731 (quoting Restatement of Torts, §757, comment b).

However, "[t]he secrecy in which a purported trade secret is shrouded need not be absolute." Id.;

see also Sun Dial Corp. v. Rideout, 29 N.J. Super. 361, 368 (App. Div. 1954) ("Absolute secrecy

is not required, but rather that qualified secrecy which arises from mutual understanding and is

required alike by good faith and good morals."). The owner of the secret is merely required to

take "reasonable" precautions to guard the secrecy of the secret. Id; see also Shamrock Tech., Inc.

v. Med. Sterilization, Inc., 808 F. Supp. 932, 937 (E.D.N.Y. 1992)(applying New Jersey trade

secrets law).

### ii.    Analysis

IRI argues that the SyncSort UNIX command language should not be afforded trade

secret protection because the language has been widely and publically displayed and Syncsort has

not taken adequate steps to protect its secrecy.  Specifically, IRI points to the following public

**NOT FOR PUBLICATION**

disclosures of the language and argues that these disclosures, when added together, revealed the language:

(1)     The University of Illinois at Chicago publically posted "man pages" for SyncSort UNIX on its website. IRI argues that these "man pages" disclose the SyncSort UNIX language to the same degree that the Reference Guide reveals the language.  IRI claims that one of its employees, Susan Strickland, was able to download the "man pages" from the website on May 16, 2006, more than a year after this litigation began. Furthermore, it claims that the "Internet Archive Wayback Machine"[6] indicates that the site was available as early as November 19, 2001.

(2)     The command language was publically discussed on the "IT toolbox" website, a forum where users of various software applications, including SyncSort UNIX, post questions and answers regarding tasks that they are attempting to complete using the software.  IRI argues that users of SyncSort posted questions regarding how to write scripts to accomplish certain sorting results and were then provided answers by other users or Syncsort's technical support personnel. IRI claims that these answers contained examples of SyncSort UNIX programming language and grammar.

(3)     Portions of the command language were disclosed in two documents posted on the internet – Paul Boal's <u>Syncsort Application Guidelines</u> and David Weigel's <u>Technical Bulletin #005 – Syncsort – Sample Job 1</u>.  IRI concedes that these documents did not disclose "large amounts" of the command language.

(4)     The scripts written by customers themselves revealed significant portions of the language and IRI claims that it was provided a large number of these scripts by former SyncSort UNIX

---

[6] The "Internet Archive Wayback Machine" is a website which allows users to types in an Internet web address and see the page as it existed in various times in the past.

NOT FOR PUBLICATION

customers. It argues that the language can be "reverse engineered" from these scripts and customers descriptions of the tasks that they were trying to accomplish when writing the scripts.

In response, Syncsort contends that these limited disclosures are insufficient to negate the trade secrecy status of the language. It asserts that there are issues of material fact which require jury determinations as to whether the language was in fact a trade secret and whether Syncsort took adequate steps to protect it.  According to Syncsort, the "man pages" were only available on the University of Illinois website as the result of a technical glitch which allowed Ms. Strickland to type the exact website address into her browser to access the pages without entering a password.  It argues that "publication on the Internet does not necessarily destroy the secret if the publication is sufficiently obscure or transient or otherwise limited so that it does not become generally known to the relevant people." DVD Copy Control Ass'n v. Bunner, 116 Cal. App. 4th 241, 251 (Cal. Ct. App. 2004). With respect the remaining disclosures, Syncsort argues that these disclosures merely revealed small portions of the language, not the language in its entirety, and that such limited disclosures do not negate the trade secret status of the language as a whole. See Dickerman Assocs. Inc. v. Tiverton Bottled Gas Co., 594 F. Supp. 30, 33-34 (D. Mass. 1984) (holding that disclosure of aspects of a software program to potential customers before their signing confidentiality provisions did not negate the trade secret status of the software because the portions "represent[ed] a small fraction of the whole,... [which was] too limited to permit an understanding of the program's design and architecture.").  Syncsort argues that IRI's own conduct demonstrated that the language in its entirety could not be "reverse engineered" from the customer scripts since its developer now admits that he "may have" made use of the Reference Guide to develop the SS2USCL convertor.  Finally, Syncsort points to the protections it

-10-

NOT FOR PUBLICATION

employed to protect the secrecy of the language, including: licencing agreements, confidentiality legends in the Reference Guide, confidentiality agreements with employees, confidentiality provisions in agreements with distributors, keeping the supply of the program under lock and key, maintaining tight access controls on computers where the program was developed, and contractual prohibitions against reverse engineering and dissemination of "any information" information related to SyncSort UNIX.

IRI has established that there were some limited public disclosures of the SyncSort UNIX command language. However, "absolute secrecy is not required." Sun Dial Corp., 29 N.J. Super. at 368. That portions of the language may have been the subject of public discussion and knowledge does not require this Court to conclude that the language as a whole was not a trade secret. See Rohm & Haas Co., 689 F.2d at 433 ("[E]ven though each and every element of plaintiff's process is known to the industry, the combination of those elements may be a trade secret if it produced a product superior to that of competitors."). The question of secrecy is a fact intensive determination guided by a number of factors. See Ingersoll-Rand Co., 110 N.J. at 637 (quoting Restatement of Torts, § 757 comment b). There are cases in which the facts overwhelmingly establish that the purported trade secret was so widely revealed that it was "a matter of general knowledge" and summary judgment must be granted. However, this is not one of those cases. Syncsort has presented sufficient evidence which, if viewed in the light most favorable to it, could lead a reasonable jury to conclude that the SyncSort UNIX language was a trade secret which Syncsort took reasonable steps to protect.

Because questions of material fact exist, summary judgment is denied on the trade secret misappropriation claim.

-11-

NOT FOR PUBLICATION

### 2.   Damages on the Trade Secret Misappropriation Claim

Syncsort seeks to recover damages on its trade secret misappropriation claim based on its lost profits.  To recover such damages, the plaintiff must show that these profits were lost because of the defendant's wrongful conduct.  See MicroStrategy, Inc. v. Bus. Objects, S.A., 429 F.3d 1344, 1358 (Fed. Cir. 2005) (affirming grant of partial summary judgment on damages on trade secret misappropriation where plaintiff "did not show the amount of damages sustained with reasonable certainty or a causal connection between the damages it suffered and the actions of [the defendant]."); see also  Rohm & Haas, 689 F.2d at 430 (one element of the trade secret misappropriation claim is that the trade secret was "used by the competitor to plaintiff's detriment"); Cromartie v. Carteret Sav. & Loan, 277 N.J. Super. 88, 103 (App. Div. 1994) ("To recover lost profits, a party must show that profits were lost as a result of the actionable conduct complained of.").  The plaintiff must show that were it not for the defendant's misappropriation of its trade secret it would not have suffered the damages complained of.  This requires establishing not only that the convertor was created using trade secret information, but also demonstrating that because of this convertor Syncsort lost business to IRI or was forced to give discounts to customers who were considering making the switch to IRI's product.

In arguing that Syncsort can not prove causation, IRI points to two pieces of evidence. First, it points to an affidavit submitted by Steve Reynolds, who was director of engineering at Innovata at the time Innovata declined to renew its SyncSort license and switched to CoSORT. In this affidavit Mr. Reynolds states that "IRI's ability to convert existing scripts using software tools or by hand was not a factor in Innovata's decision to change sort software products and to license CoSORT for UNIX." (Reynolds Decl. at ¶ 9.)  Reynolds goes on to provide the reasons

**NOT FOR PUBLICATION**

why Innovata made the switch, which included license duration, cost, performance and technical support. (Id. at ¶ 7.)  Next, IRI points to the deposition testimony of Syncsort's employees: Marianne DeRosa, one of Syncsort's two sales managers, was specifically asked at her deposition whether she knew of any circumstances in which a customer or potential customer was lost or given a discount because CoSORT had conversion capabilities. She replied that she did not recall any specific incident. (DeRosa Dep. Tr. at 31.)  Similarly, Ms. Schmitz, a Syncsort sales representative, was asked the same question and responded "No." (Schmitz Dep. Tr. at 43-45; 64-65.)

At oral argument, the Court gave Syncsort's counsel the specific opportunity to list all the evidence that Syncsort would use to establish causation.  Syncsort advanced the following circumstantial evidence:  First, it intends to introduce evidence from its sales database to demonstrate that CoSORT was a competitor product in certain sales and that Syncsort was forced to give a discount on those sales or lost a sale because of CoSORT's competition.  (Hearing Tr. 45-46.)  Second, Syncsort intends to produce evidence from IRI's sales database which it claims contains notations on particular transactions and the importance of the translator on those transactions.[7] (Id. at 46-47.)  Third, Syncsort intends to cross-examine Lisa Mangino, IRI's marketing director, and David Friedland, IRI's vice-president. (Id. at 50.)  Friedland submitted an affidavit, which he affirmed during his deposition, stating that "[s]ales to customers who want to

---

[7] During oral argument, Syncsort's counsel stated that the "sales database includes innumerable references to the use of the translator as how important that was to the particular transaction at issue. It shows David Friedland of IRI marketing that translator, arguing that it can take this customer from Syncsort because it can translate all of these scripts." (Hearing Tr. at 46:15-20.)  However, Syncsort has pointed to no specific document which contains this admission.  At the summary judgment stage the plaintiff must point to concrete evidence not conclusory statements. See Olympic Junior, Inc. v. David Crystal, Inc., 463 F.2d 1141, 1146 (3d Cir. 1972)("[C]onclusory statements, general denials, and factual allegations not based on personal knowledge [are] insufficient to avoid summary judgment.")

**NOT FOR PUBLICATION**

use SSU2SCL ... comprise[] a significant share of IRI's business." (Friedland Decl. at 2, ¶ 19.)

Additionally, Mangino testified during her deposition that when marketing CoSORT it is

important to stress the effectiveness of the convertor. (Magino Dep. 467:10-15.)  Fourth,

Syncsort points to an email from Billy Sterling of Innovata to IRI employee Susan Strickland,

copying Steve Reynolds (the Innovata director of engineering who submitted an affidavit stating

that the convertor was not a factor in Innovata's decision to change software) in which Sterling

states: "That feature [the RESCRIPT front end to SSU2SCL] of your product was very important

to us. If it will not reliably work then the value of CoSORT is diminished greatly." (Pls' Opp. at

23.) At oral argument, Syncsort's counsel stated that they have "similar entries for many, many

transactions in [IRI's] sales database in where... the customer is saying we have a lot of scripts

that need to be translated. We cannot buy CoSORT unless we translate those scripts. And it's

again and again and again." (Hearing Tr. at 55:14-22.)  However, Syncsort has failed to point to

any specific documents in which other customers actually state that they would not buy CoSORT

unless it had the ability to convert scripts. Such conclusory statements are insufficient at the

summary judgment stage. See Olympic Junior, 463 F.2d at 1146.

Fifth, Syncsort plans to put its employees on the stand to explain the financial and

competitive importance of scripts. (Hearing Tr. at 56.)  Sixth, Syncsort intends to introduce IRI's

marketing literature which describes the functioning of the translator and why customers would

want the feature. (Id. at 57.)  Finally, Syncsort seeks to rely on the expert testimony of Ted

Martens.  Yet, Syncsort's counsel has conceded that Martens is not being offered as a causation

expert and argued, in defense of the motion to strike Martens' report, that a damages expert need

not assert or demonstrate causation but that causation can be demonstrated by other means. (Pls'

NOT FOR PUBLICATION

Opp. to Motion to Strike Martens at 20.)  Martens' report captured all customers who either: (1) investigat[ed] CoSORT's convertor utility; (2) ... us[ed] CoSORT's converter utility to translate scipts; (3) investigat[ed] use of CoSort during the time period in which IRI was engaging in false advertizing of its CoSORT product; and (4) former Syncsort customers that switched to CoSORT." (Id.)  By Syncsort's own admission, the customers listed in Martens' report are a much broader spectrum than just those who were lost to IRI or given discounts because of the SSU2SCL convertor.  The report provides no guidance as to how those customers whose loss was caused by IRI's misappropriation of Syncsort's trade secret can be distinguished from all those new and old customers who merely investigated CoSort at the time that IRI was engaged in the alleged false advertizing or those customers who left Syncsort for other reasons.

Looking at all this evidence, its individual components as well as its overall entirety, none of it quantitatively or qualitatively amounts to sufficient evidence of causation – particularly in the context of the Syncsort's own witnesses testifying that they are not aware of any customers who switched to CoSORT or were given a discount because of CoSORT's ability to convert scripts from SyncSort's language to CoSORT's language. The evidence proffered by Syncsort is simply insufficient.  While the evidence may be sufficient for a reasonable jury to conclude that Syncsort lost business because of competition from IRI, or even that customers valued the SSU2SCL convertor's ability to convert scripts from the SyncSort language to the CoSORT language, it not sufficient for a reasonable jury to conclude what is required to prove causation, that Syncsort lost business to IRI because of the SSU2SCL convertor.  It is simply not enough for a reasonable jury to figure out if, and to what extent, Syncsort was harmed by IRI's wrongful

NOT FOR PUBLICATION

conduct. Summary judgment is granted to IRI on the issue of damages on the trade secret

misappropriation claim.

### 3.     Tortious Inference with Contract Claim

Syncsort claims that IRI tortiously interfered with its contracts with third parties in two

ways: (1) when IRI obtained a copy of the Reference Manual from a Brazilian third-party and (2)

when IRI obtained SyncSort UNIX scripts from customers.

To state a claim for tortious interference with a contract, a pleading party must prove: "(1)

actual interference with a contract; (2) that the interference was inflicted intentionally by a

defendant who is not a party to the contract; (3) that the interference was without justification;

and (4) that the interference caused damage." 214 Corp. v. Casino Reinv. Dev. Auth., 280 N.J.

Super. 624, 628 (N.J. Super. L. 1994).

"In order to show intentional interference, a plaintiff must demonstrate that the defendant

acted with either an intent to interfere with plaintiff's contract right or acted with knowledge that

his actions would interfere with the contract right." DiGiorgio Corp. v. Mendez & Co., 230 F.

Supp. 2d 552, 564 (D.N.J. 2002)(Walls, J.)(citing Velop, Inc. v. Kaplan, 32 N.J. Super. 32, 49

(App. Div. 1997)). "As a threshold matter, therefore, a plaintiff must show that defendant had

knowledge of the existing contract. General knowledge of a business relationship is not

sufficient; the defendant must have specific knowledge of the contract upon which his actions

infringe." Id.

Moreover, a plaintiff must prove that the harm was inflicted without justification or

excuse. The inquiry into whether the defendant's actions were improper is flexible and guided by

the following factors on a case-by-case basis: (i) the nature of the actor's conduct; (ii) the actor's

**NOT FOR PUBLICATION**

motive; (iii) the interests of the party with which the actor's conduct interferes; (iv) the interests sought to be advanced by the actor; (v) the social interests in protecting the freedom of action of the actor and the commercial interests of the other party; (vi) the proximity or remoteness of the actor's conduct to the interference; and (vii) the relations between the parties. Id. (citing Restatement (Second) of Torts, § 767 (1979)). "Often it is stated that the relevant inquiry is whether the conduct was sanctioned by the 'rules of the game,' for where a plaintiff's loss of business is merely the incident of healthy competition, there is no compensable tort injury." Id. (quoting Lamorte Burns & Co. v. Walters, 167 N.J. 285, 306 (2001).

Syncsort's first allegation, that IRI induced a breach of contract when it obtained a copy of the Reference Manual, falls far short of supporting a tortious interference claim. Syncsort does not even attempt to argue that IRI had actual knowledge of the contract between Syncsort and the unidentified Brazilian third-party, rather it argues that "IRI was on notice of the general custom in the data transformation field for licensing agreements to restrict distribution of materials such as software manuals." (Pls' Opp. at 26.)  Such generalized knowledge is insufficient to support a finding that IRI acted with the intent to interfere with a contract; the law requires the plaintiff to show that IRI acted with "specific knowledge of the contract upon which [its] action infringe[d]." DiGiorgio, 230 F. Supp. 2d at 564; see also Linkco, Inc. v. Fujitsu Ltd., 230 F. Supp. 2d 492, 496-98 (S.D.N.Y. 2002)(granting judgment as a matter of law on a claim in which the plaintiff had only presented evidence that the types of agreement in question was "a matter of course" and "common practice" in the industry, but had not presented any evidence that the defendant had actual knowledge of the contract in question).  Furthermore, the plaintiff has presented no evidence to show that IRI actually acted in anyway that was outside the "rules of the game" to

**NOT FOR PUBLICATION**

induce the unidentified Brazilian third-party to breach its contract and send IRI the Reference Guide. See Woods Corp. Assoc. v. Signet Star Holdings, 910 F. Supp. 1019, 1031 (D.N.J.1995) (stating that a claim of tortious interference with a contract requires a showing of "intentional doing of a wrongful act without justification or excuse").

Syncsort's second allegation, that IRI interfered with Syncsort's licensing agreement with its customers when IRI obtained copies of the customer's SyncSort UNIX scripts, similarly fails.  The licensing agreements that Syncsort enters into with purchasers of SyncSort UNIX licenses prohibit the customer from disclosing "any information related to the Software." (Licensing Agreement ¶ 4.)  According to Syncsort, IRI induced a breach of this provision when it acquired job control scripts from Syncsort's customers.  Syncsort contends that, even if IRI did not know about the provision before the start of this litigation, it certainly should have been aware of this provision after Syncsort filed its complaint. Yet, according to Syncsort, IRI continued to solicit customer scripts even after the filing of the lawsuit.  Syncsort alleges that IRI had no justification for its acts because it used the customer scripts to discover the SyncSort UNIX language.  And misappropriation of trade secrets is a violation of commercial morality and not within the rules of the game. However, this argument misses the point that if IRI had reverse engineered the SyncSort UNIX language from customer scripts there would be no trade secret misappropriation violation. See Smith v. BIC Corp., 869 F.2d 194, 199 (3d Cir. 1989) ("[I]nformation that is in the public domain or which has been 'reverse engineered,' – i.e., garnered by beginning with the finished product and determining the process used to manufacture it – cannot be protected as trade secrets.") Finally, Syncsort argues, through reference to its damages discussion in the context of the trade secret misappropriation claim, that it was damaged

-18-

NOT FOR PUBLICATION

by this interference. Because Syncsort's damages and causation argument fails with respect to the

trade secret misappropriation claim, it fails here as well.

Summary judgment is granted to IRI on the tortious interference with contract claim.

**4.     False Advertising Claim**

Section 43(a)(1)(B) of the Lanham Act provides in relevant part:

> Any person who, on or in connection with any goods or services, or any container
> for goods, uses in commerce any word, term, name, symbol, or device, or any
> combination thereof, or any false designation of origin, false or misleading
> description of fact, or false or misleading representation of fact, which–
> ... (B) in commercial advertising or promotion, misrepresents the nature,
> characteristics, qualities, or geographic origin of his or her or another person's
> goods, services, or commercial activities,
> shall be liable in a civil action by any person who believes that he or she is or is
> likely to be damaged by such act.

15 U.S.C. § 1125(a)(1)(B). To establish a Lanham Act claim based on a false or misleading

representation of a product, the plaintiff must show:

> 1) that the defendant has made false or misleading statements as to his own
> product or another's;
> 2) that there is actual deception or at least a tendency to deceive a substantial
> portion of the intended audience;
> 3) that the deception is material in that it is likely to influence purchasing
> decisions;
> 4) that the advertised goods traveled in interstate commerce; and
> 5) that there is a likelihood of injury to the plaintiff in terms of declining sales,
> loss of good will, etc..

Warner-Lambert Co. v. Breathasure, Inc., 204 F.3d 87, 91-92 (3d Cir. 2000). Liability arises if

the advertising is "either (1) literally false or (2) literally true or ambiguous, but has the tendency

to deceive consumers." Novartis Consumer Health, Inc. v. Johnson & Johnson-Merck Consumer

Pharma Co., 290 F.3d 578, 586 (3d Cir. 2002).  "If a plaintiff proves a challenged claim is

literally false, a court may grant relief without considering whether the buying public was

**NOT FOR PUBLICATION**

misled." <u>Johnson & Johnson-Merck Consumer Pharm. Co. v. Rhone-Poulenc Rorer Pharm., Inc.</u>, 19 F.3d 125, 129 (3d Cir. 1994). However, if the allegation is not that the advertisement was literally false, but that it was "literally true, but, given the ... context, it nevertheless is likely to mislead and confuse consumers" the plaintiff must show "actual deception." <u>Castrol Inc. v. Pennzoil Co.</u>, 987 F.2d 939, 943 (3d Cir. 1993).

However, even if a violation of the Lanham Act is established, a plaintiff, who seeks monetary damages[8], rather than purely injunctive relief[9], "must show that the falsification or misrepresentation actually deceives a portion of the buying public." <u>U.S. Healthcare, Inc. v. Blue Cross of Greater Phila.</u>, 898 F.2d 914, 922 (3d Cir. 1990)(citing <u>Parkway Baking Co. v. Freihofer Baking Co.</u>, 255 F.2d 641, 648 (3d Cir. 1958). At this stage "[t]his does not place upon the plaintiff a burden of proving detailed individualization of loss of sales. Such proof goes to quantum of damages and not to the very right of recovery." <u>Id</u>; <u>see also</u> <u>Warner-Lambert</u>, 204 F.3d at 92 ("[A] plaintiff seeking damages under § 43(a)  must establish customer reliance but need not quantify loss of sales as that goes to the measure of damages, not plaintiff's cause of action."); <u>Regscan, Inc. v. Brewer</u>, 2007 WL 879420, *4 (E.D.Pa. March 16, 2007)("[I]n order to survive a motion for summary judgment [on the Lanham Act claim], [plaintiff] is also required to produce evidence that it has been damaged in some way by [defendant's] actions."). The rationale of this rule is that the purpose behind "Section 43(a) was to promote fair business

---

[8] Section 35(a) of the Lanham Act provides that when a violation of 43(a) has been established "the plaintiff shall be entitled ... to recover (1) defendant's profits, (2) any damages sustained by the plaintiff, and (3) the costs of the action." 15 U.S.C. § 1117.

[9] A plaintiff seeking only an injunction needs only to demonstrate "a reasonable basis for the belief that plaintiff is likely to be damaged as a result of the false advertising." <u>Warner-Lambert</u>, 204 F.3d at 95.

NOT FOR PUBLICATION

dealings .... not to provide a windfall to an overly eager competitor." <u>Parkway Baking</u>, 255 F.2d
at 649.

IRI not longer uses the particular marketing statement described in the complaint, and
since injunctive relief is no longer necessary, the only question is whether Syncsort has made out
a claim for damages resulting from the false advertising.  See <u>Parkway Baking</u>, 255 F.2d at 649
("[W]here there has been a cessation of the conduct complaint of, at any time prior to the
judgment, it is a matter for the exercise of the discretion of the court, as to whether an injunction
should issue.").  Even if Syncsort can establish a Lanham Act violation, in order to recover
damages Syncsort must show that it was damaged a result of IRI's false advertising or that IRI
profited from the false advertising.  See 15 U.S.C. § 1117; <u>Regscan</u>, 2007 WL 879420, at * 4.
To do so, Syncsort must make "a showing of some customer reliance on the false advertising."
<u>Parkway Baking</u>, 255 F.2d at 648.  Syncsort has not made such a showing.  It merely makes a
generalized statement that "as it is shown *supra* in [the section addressing damages on the trade
secret misappropriation claims][10], there is evidence that the improper conduct by IRI, including
its false advertizing, damaged Syncsort." (Pls' Opp. at 30-31.)   Instead of even attempting to
point to evidence that customers were actually deceived or relied on the advertising statement,
Syncsort argues that Third Circuit law does not require it to show actual reliance if the statements
were literally false.  Syncsort confuses what is required of a plaintiff who seeks injunctive relief
and what is required of a plaintiff who seeks damages. See <u>Regscan</u>, 2007 WL 879420, at * 4 fn.

---

[10] As previously discussed, the evidence of damages arising from the trade secret
misappropriation is insufficient to satisfy Syncsort's burden in the context of that claim.  It fares no
better in the context of the false advertising claim.  The fact that customers may have chosen IRI instead
of Syncsort, or were given discounts at Syncsort, during the time that IRI engaged in this allegedly false
advertising does not establish that the harm to Syncsort stemmed from that advertising – *i.e.* that these
customers saw that advertising and relied on it in making their decision about sorting software.

NOT FOR PUBLICATION

1 ("[R]ecent cases have also recognized the distinction between the proof required to establish a claim for damages as opposed to one for injunctive relief under Section 43(a)."); <u>see also</u> <u>Warner-Lambert</u>, 204 F.3d at 92 (recognized that in <u>Parkway Baking</u> the Third Circuit "held that a plaintiff seeking damages under § 43(a) must establish customer reliance ... *in cases of injunction*, however, there seems to be no requirement that purchasers actually be deceived.")(emphasis in original).

Syncsort's present claim under § 43(a) is one for damages and Syncsort has failed to advance any evidence in support of what is required of a plaintiff seeking such relief – actual customer reliance or deception.  <u>See</u> <u>Warner-Lambert</u>, 204 F.3d at 92.  Summary judgment is granted to IRI as to the false advertising claim.

**5.      Trademark Infringement and Dilution Claim**

"To prevail on a claim for trademark infringement or unfair competition under the Lanham Act, the owner of a valid and legally protectable mark ... must show that a defendant's use of a similar mark for its goods causes a likelihood of confusion." <u>Kos Pharms., Inc. v. Andrx Corp.</u>, 369 F.3d 700, 708-09 (3d Cir. 2004). The parties do not dispute that IRI actually put the "syncsort" metatag on its website for some period of time; they do not dispute that "syncsort" is a distinctive mark associated with Syncsort.  The only portion of this test at issue is the question of whether the use of this mark created "a likelihood of confusion."

Likelihood of confusion is a question of fact. See <u>Checkpoint Sys., Inc. v. Check Point Software Techs., Inc.</u>, 269 F.3d 270, 301 (3d Cir. 2001).  "To prove likelihood of confusion plaintiffs must show that customers viewing the mark would probably assume the product or

-22-

**NOT FOR PUBLICATION**

service it represents is associated with the source of a different product or service identified by a

similar mark." <u>Id.</u>

The Third Circuit has adopted a non-exhaustive list of factors, known as the "<u>Lapp</u>

factors," to consider in evaluating the likelihood of confusion. <u>Interpace Corp. v. Lapp, Inc.</u>, 721

F.2d 460, 463 (3d Cir. 1983). These factors, as adapted to apply to goods that compete directly

are:

> (1) the degree of similarity between the owner's mark and the alleged infringing
> mark;
> (2) the strength of the owner's mark;
> (3) the price of the goods and other factors indicative of the care and attention
> expected of consumers when making a purchase;
> (4) the length of time the defendant has used the mark without evidence of actual
> confusion arising;
> (5) the intent of the defendant in adopting the mark;
> (6) the evidence of actual confusion;
> (7) whether the goods, competing or not competing, are marketed through the
> same channels of trade and advertised through the same media;
> (8) the extent to which the targets of the parties' sales efforts are the same;
> (9) the relationship of the goods in the minds of consumers, whether because of
> the near-identity of the products, the similarity of function, or other factors;
> (10) other facts suggesting that the consuming public might expect the prior
> owner to manufacture both products, or expect the prior owner to manufacture a
> product in the defendant's market, or expect that the prior owner is likely to
> expand into the defendant's market.

<u>KOS Pharms.</u>, 369 F.3d at 709 (citation omitted). "None of these factors is determinative in the

likelihood of confusion analysis and each factor must be weighed and balanced one against the

others." <u>Id.</u> (citations omitted). "[T]he different factors may properly be accorded different

weights depending on the particular factual setting. A district court should utilize the factors that

seem appropriate to a given situation." <u>Id.</u> (citation omitted). "[I]f a district court finds certain of

the <u>Lapp</u> factors are inapplicable or unhelpful in a particular case, that court should explain its

choice not to employ those factors." <u>Id.</u> at 711 (citation and quotes omitted.)

**NOT FOR PUBLICATION**

Motivated by the concern that a defendant can take a "free ride on the goodwill" of an established mark to garner interest for its product, Courts permit recovery for "initial interest confusion" even though the consumer quickly became aware of the product's actual source and no purchase was made as result of the confusion. Checkpoint Sys., Inc. v. Check Point Software Tech., Inc., 269 F.3d 270, 293-95 (3d Cir. 2001). Product relatedness and level of care exercised by consumers are relevant factors in determining initial interest confusion. Id. at 296. The "significance [of initial interest confusion] will vary, and must be determined on a case-by-case basis. Id. at 297.

However, not all uses of a trademark are actionable, the fair use doctrine allows the use of a competitor's mark truthfully to identify the competitor's goods. In Century 21 Real Estate Corp. v. Lendingtree Inc., 425 F.3d 211, 222 (3d Cir. 2005), the Third Circuit established a two-step approach for nominative fair use cases:

> The plaintiff must first prove that confusion is likely due to the defendant's use of the plaintiff's mark.. ... Once the plaintiff has met its burden of proving that confusion is likely, the burden then shifts to defendant to show that its nominative use of the plaintiff's mark is nonetheless fair. To demonstrate fairness, the defendant must satisfy a three-pronged nominative fair use test ... a defendant must show: (1) that the use of the plaintiff's mark is necessary to describe both the plaintiff's product or service and the defendant's product or service; (2) that the defendant uses only so much of the plaintiff's mark as is necessary to describe plaintiff's product; and (3) that the defendant's conduct or language reflect the true and accurate relationship between plaintiff and defendant's products or services.

Id. The Third Circuit recognized that in the nominative use situation, where by definition the defendant is using "*another's* trademark in order to describe the trademark owner's *own* product ... certain of the Lapp factors applied mechanically would inevitably point towards confusion where no likelihood of confusion may actually exist." Id. at 224. Thus, the Circuit held that in

**NOT FOR PUBLICATION**

nominative use cases, the use of the first two Lapp factors, the similarity of the mark and the

strength of the mark, was inappropriate. Id. at 224-25.  The "fair use doctrine applies in

cyberspace as it does in the real world." Brookfield Communs., Inc. v. West Coast Entm't Corp.,

174 F.3d 1036, 1065 (9th Cir. 1999); see also Bijur Lubricating Corp. v. Devco Corp., 332 F.

Supp. 2d 722 (D.N.J. 2004) (Walls, J.) (holding that the defendant's uses of the plaintiff's

trademark in the descriptions of its products and in a metatag on its website "were not deceptive

as a matter of law [because] a commercial rival is permitted to use the original manufacturer's

name truthfully to describe a replacement part."); Playboy Enters., Inc. v. Welles, 279 F.3d 796

(9th Cir. 2002)(holding that the use of the terms "Playboy," "Playmate," and "Playmate of the

Year 1981" on the website masthead, banner ads, and metatags of the website of a former

Playmate of the Year were nominative fair uses because they served to identify the defendant and

the content of the website).

        An analysis of the seven Lapp factors that the Third Circuit identified in Century 21 as

applicable in cases, such as this, when the defendant has used the plaintiff's trademark to

describe the capabilities of its own product does not point overwhelmingly either for or against a

finding of a likelihood of confusion. The first and fourth factors point against a finding of

confusion. Purchasers of sorting programs which typically cost tens of thousands of dollars are

sophisticated individuals with technical knowledge who conduct trials of the software before

making a purchase. There is no evidence of customers actually being confused.  In fact when

specifically asked during their depositions Syncsort employees Marianne DeRosa and Carol

Schmitz could recall no instance in which a customer complained about being confused by IRI's

website.  The fifth, sixth, and seventh factors point towards a finding of confusion – these

**NOT FOR PUBLICATION**

programs are marketed through the same channels and media, they target the same customers, and they are nearly identical.  Insufficient evidence has been presented to evaluate the second and third factors. Neither side has presented evidence to demonstrate how long the metatag was used by IRI.  Neither side has pointed to concrete evidence establishing IRI's intent behind using the "syncsort" metatag – Syncsort argues that IRI put the metatag on the site to confuse customers and attract those looking for the SyncSort UNIX software to the CoSORT software.   IRI, on the other hand, contends that it merely wanted to alert customers about IRI's translation ability. Questions of material fact remain as to whether the <u>Lapp</u> factors point to or against confusion.

      Notwithstanding that the plaintiff has not now met its burden to show confusion because of issues of material fact, the Court will examine whether IRI has established now the fair use defense. The first prong has been met; the use of the term "syncsort" is necessary to describe IRI's product.  There is no meaningful way to describe the functioning of the SSU2SCL convertor without using the term "syncsort" since the convertor translates scripts from the SyncSort language to the CoSORT language. The second prong has also been met; IRI only used the "syncsort" term in its metatag once on its website. This is not a situation in which IRI used the "syncsort" term repeatedly in the metatag to cause its site to appear above Syncsort's website in searches. See <u>Playboy Enters.</u>, 279 F.3d at 804 (holding that use of a trademarked term in metatag was protected by fair use doctrine, but noting that result might differ if the trademarked term has been listed so repeatedly as to appear above the trademark holder's website in search results). The third prong has also been met, the website reflects the true relationship between Syncsort and the IRI product. The website does not claim a relationship between Syncsort and IRI (nor the CoSORT program). Clearly the website explains in its "Notice to Other Sort Users"

NOT FOR PUBLICATION

that the "ssu2scl" convertor is capable of automatically converting SyncSort job specification files. (Def's Appx. Tab 47). Syncsort does not claim that the website text confuses the relationship between the two products, rather it argues that the relationship between the two products is confused when a user searches for "syncsort" and is provided a list of search results which includes the IRI website. This argument is unpersuasive.  In a case in which the defendant was alleged to have used the plaintiff's trademark in its metatags, the reasoning of a recent Eastern District of Pennsylvania decision granting defendant's motion to dismiss is particularly insightful, and appropriate here:

> At no point are potential consumers 'taken by a search engine' to defendant's website due to defendant's use of plaintiff's marks in meta tags. Rather ... a link to the defendant's website appears on the search results pages as one of the many choices for the potential consumer to investigate.... links to defendant's website always appear as independent and distinct links on the search result page.... Due to the separate and distinct nature of the links created on any of the search results pages in question, potential consumers have no opportunity to confuse defendant's services, goods, advertisements, links or websites for those of the plaintiff. Therefore, I find that initial interest protection does not apply here. Because no reasonable factfinder could find a likelihood of confusion under the set of facts alleged by the plaintiff, I will grant defendant's motion to dismiss.

J.G. Wentworth, S.S.C. L.P v. Settlement Funding LLC, 06-cv-597, 2007 WL 30115, *7-8 (E.D. Pa. Jan. 4, 2007).

Because IRI has demonstrated now its entitlement to the fair use of the "syncsort" trademark in its metatags to describe the converting abilities of the SSU2SCL product, summary judgment is granted to IRI on the trademark infringement claim.

### E.    Unfair Competition

An unfair competition claim is not merely limited to (1) the passing off of one's goods or services as those of another and (2) unprivileged limitation. See SK&F, Co. v. Premo Pharm.

-27-

NOT FOR PUBLICATION

Labs., Inc., 625 F.2d 1055, 1062 (3d Cir. 1980). As the New Jersey Appellate Division

explained:

> [T]he essence of unfair competition is fair play. Thus, the purpose of the law regarding unfair competition is to promote higher ethical standards in the business world. Accordingly, the concept is deemed as flexible and elastic as the evolving standards of commercial morality demand. The judicial goal should be to discourage, or prohibit the use of misleading or deceptive practices which renders competition unfair. The law must be flexible to accommodate those goals.

Ryan v. Carmona Bolen Home for Funerals, 341 N.J. Super. 87, 92 (App. Div. 2001)(citations

and quotations omitted).

The parties agree that the unfair competition claim is based on Syncsort's other claims,

including its trade secret misappropriation claim. As there are questions of material fact

regarding the Syncsort's trade secret misappropriation claim, summary judgment must similarly

be denied as to Syncsort's unfair competition claim.

III.   **SYNCSORT'S MOTION FOR SUMMARY JUDGMENT ON IRI'S COUNTERCLAIMS**

   A.   **Monopolization**

The Sherman Act subjects to antitrust liability "[e]very person who shall monopolize, or

attempt to monopolize, or combine or conspire with any other person or persons, to monopolize

any part of the trade or commerce among the several States...." 15 U.S.C. § 2. "To prevail on an

attempted monopolization claim under § 2 of the Sherman Act, 'a plaintiff must prove that the

defendant (1) engaged in predatory or anticompetitive conduct with (2) specific intent to

monopolize and with (3) a dangerous probability of achieving monopoly power.'" Queen City

Pizza, Inc. v. Domino's Pizza, Inc., 124 F.3d 430, 442 (3d Cir. 1997)(quoting Spectrum Sports,

Inc. v. McQuillan, 506 U.S. 447, 456).  IRI asserts two theories of predatory or anti-competitive

NOT FOR PUBLICATION

conduct by Syncsort.  First, IRI alleges that Syncsort charged predatory prices for the SyncSort

UNIX software in order to entice customers to enter into multi-year licensing agreements with

Syncsort which would then preclude customer for switching to a competitor's sorting product in

an effort to monopolize the market. Second, IRI claims that Syncsort engaged in this "sham

litigation" for the purpose of interfering with IRI's business relationship and to force IRI from the

market.

### 1.      Predatory Pricing

A business can violate the Sherman Act by engaging in predatory pricing, *i.e.* cutting

prices in order to force the competitors out of the market.  Matsushita Elec. Indus. Co. v. Zenith

Radio Corp., 475 U.S. 574, 584-85 (1986).  In order to make out a predatory-pricing claim under

Section 2 of the Sherman Act, a plaintiff must prove: (1) "that the prices complained of are

below an appropriate measure of its rival's costs"; and (2) "that the competitor has ... a dangerous

probability, of recouping its investment in below-cost prices."  Brooke Group Ltd. v. Brown &

Williamson Tobacco Corp., 509 U.S. 209, 222-24 (1993). The Third Circuit has recognized that

no consensus has been reached about the proper definition of "cost" in the context of a predatory

pricing claim.   Advo, Inc. v. Phila. Newspapers, Inc., 51 F.3d 1191, 1198 (3d Cir. 1995). In

Advo, the Third Circuit commented that marginal cost is the most important measure of cost in

an economic sense, and "[a]s long as a firm's prices exceed its marginal cost, . . . [s]uch pricing is

presumably not predatory." Id.  Furthermore, "as a practical matter, it may be that only *direct*

evidence of below-cost pricing is sufficient to overcome the strong inference that rational

business would not enter into [predatory pricing] conspiracies." Id. at 1198 (quoting Matsushita,

475 U.S. at 584, fn. 8). The Supreme Court has stressed that "predatory pricing schemes are

**NOT FOR PUBLICATION**

rarely tried, and even more rarely successful." <u>Matsushita</u>, 475 U.S. at 589.  Since "cutting prices

in order to increase business often is the very essence of competition ... mistaken inferences ...

are especially costly, because they chill the very conduct the antitrust laws are designed to

protect." <u>Id.</u> at 594.

      To survive summary judgment, the plaintiff or counter-claimant "must present more than

a scintilla of evidence that the alleged predatory conduct makes economic sense." <u>Advo</u>, 51 F.3d

at 1197; <u>see also</u> <u>Eastman Kodak Co. v. Image Tech. Serv., Inc.</u>, 504 U.S. 451 ("If the plaintiff's

theory is economically senseless, no reasonable jury could find in its favor, and summary

judgment should be granted.").  In examining whether the scheme makes "economic sense,"

courts must examine the realities of the market in order to determine whether there is a

reasonable prospect that it will be able to recover the losses incurred from below-cost pricing. <u>Id.</u>

at 1200.

      Syncsort contends that not only has IRI not presented any "direct evidence" that Syncsort

sold its products below cost, the predatory pricing scheme does not make "economic sense"

because IRI has not shown how Syncsort will gain a monopoly and recoup its losses.

      In opposition, IRI points to the example of I-Centrix, LLC, a customer who considered

both SyncSort UNIX and CoSORT sorting software.  I-Centrix was sold a SyncSort UNIX 5 year

license for one machine and then given another 5 year license, for another machine, for free if it

agreed to remove its copy of CoSORT from that machine and not use IRI's product.  IRI argues

that the marginal cost of the sale of this license must be higher than zero.  In support of this

contention it points to the declaration of Syncsort's vice president of finance and administration,

Mr. Oifer, who stated that while the "marginal cost of a sale of a license of SyncSort for

NOT FOR PUBLICATION

Mainframe and SyncSort UNIX is *essentially* zero[,] [t]he only material marginal cost[s] associated with an additional sale [are] the sales commission payable to a salesperson responsible for the sale[,]....the nominal cost of imprinting and shipping a CD in the small minority of situations where the software is not distributed via internet download, or travel costs incurred by a sales person..." (Oifer Decl. at ¶ 3, emphasis added.)  IRI points to the evidence that I-Centrix received a CD containing the program as proof that the sale must have had *some* marginal cost greater than zero associated with the sale of this product.

While I-Centrix LLC may have received one five-year Syncsort UNIX license for free, it paid for the first five-year license.  Syncsort made money on the transaction as a whole; the price of the transaction as a whole exceeded its marginal costs. The determination of whether a product was sold at a below-cost price must be based on the entire transaction, not just on a piece of the larger deal. See Stearns Airport Equip. Co. v. FMC Corp., 170 F.3d 518, 533 fn. 15 (5th Cir. 1999) ("When a company has a 'buy one, get one free' promotion, it would be incorrect to look at the nominal price of the 'free' product-zero-and infer predation from this fact."); Kentmaster Mfg. Co. v. Jarvis Prods. Corp., 146 F.3d 691 (9th Cir. 1998) (determining that defendant's equipment and spare parts for that equipment constitute a single product and no predatory pricing claim can be made out based on the fact that defendant charged below cost prices on the equipment and then recouped those losses on the spare parts); see also Morgan v. Ponder, 892 F.2d 1355, 1362 (8th Cir. 1989)("Courts have been wary of plaintiffs' attempts to prove predatory pricing through evidence of a low price charged for a single product out of many, or to a single customer.").

NOT FOR PUBLICATION

The evidence presented by IRI, viewed in the light most favorable to it, is insufficient to create an issue of material fact with respect to whether Syncsort was charging prices below its marginal costs on SyncSort UNIX licenses. The sole example of the "buy one, get one free" deal provided to I-Centrix is insufficient convince a reasonable jury that Syncsort was engaging in predatory pricing. Even if this Court were to conclude that the price charged in this single transaction were below marginal costs, IRI has not presented evidence from which a reasonable jury could conclude that based on these isolated instances of below-cost pricing, Syncsort would be able to monopolize the UNIX sorting market and then recoup its losses by charging supra-competitive prices. Syncsort's summary judgment motion is granted on IRI's Sherman Act counterclaim of predatory pricing.

### 2.     Sham Litigation

"Those who petition government for redress are generally immune from antitrust liability." Prof'l Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc., 508 U.S. 49, 56 (1993). However, in Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 144 (1961), the Supreme Court "withheld immunity from 'sham' activities because 'application of the Sherman Act would be justified' when petitioning activity, 'ostensibly directed toward influencing governmental action, is a mere sham to cover . . . an attempt to interfere directly with the business relationships of a competitor.'" Prof'l Real Estate Investors, 508 U.S. at 56 (quoting Noerr, 365 U.S. at 144); see also California Motor Transp. Co. v. Trucking Unlimited, 404 U.S. 508, 510 (1972) (extending the Noerr-Pennington doctrine to petitions to the courts for redress). The Supreme Court has further defined the sham litigation exception to the Noerr-Pennington doctrine:

**NOT FOR PUBLICATION**

> We now outline a two-part definition of 'sham' litigation. First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits. If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under <u>Noerr</u>, and an antitrust claim premised on the sham exception must fail. Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation. Under this second part of our definition of sham, the court should focus on whether the baseless lawsuit conceals 'an attempt to interfere directly with the business relationships of a competitor,' through the 'use [of] the governmental process – as opposed to the outcome of that process – as an anticompetitive weapon.'

<u>Prof'l Real Estate Investors</u>, 508 U.S. at 60-61 (citations omitted).   "The existence of probable cause to institute legal proceedings precludes a finding that an antitrust defendant has engaged in sham litigation." <u>Id.</u> at 62.  Probable cause means "no more than a reasonable belief that there is a chance that a claim may be held valid upon adjudication." <u>Id.</u> at 62-63.

That this Court is not granting summary judgment to IRI on all of Syncsort's claims demonstrates that Syncsort had a reasonable belief that there was a chance that its claims would be upheld upon adjudication. IRI has not evidenced a question of material fact with respect to whether Syncsort engaged in a "sham" litigation.  Summary judgment is granted to Syncsort.

### B.    Tortious Interference with Contract

As has been explained in greater detail, in order to make out a claim for tortious interference with contract, a pleading party must demonstrate that a party with actual knowledge of a contract, interfered with that contract without justification and that this interference caused damage.  <u>DiGiorgio Corp. v. Mendez & Co.</u>, 230 F. Supp. 2d 552, 564 (D.N.J. 2002).  Whether the defending party acted "with justification" depends on "whether the conduct was sanctioned by the 'rules of the game,' for where a plaintiff's loss of business is merely the incident of

**NOT FOR PUBLICATION**

healthy competition, there is no compensable tort injury." Id. (quoting Lamorte Burns & Co. v. Walters, 167 N.J. 285, 306 (2001).

In support of its tortious interference claim, IRI points to the example of Barnes & Noble which, like most other IRI customers, signed a non-disclosure agreement before receiving a trial subscription of the CoSORT program.  This non-disclosure agreement contained a provision in which Barnes & Noble agreed to "safeguard IRI's software, documentation and other valuable information (defined as (but not limited to) ... price lists or offers...)" (Def's Tab. 76.)  Barnes & Noble considered both CoSORT and SyncSort UNIX software and negotiated with both companies.  Based on the documents produced during discovery, at first it appears that Barnes & Noble "plan[ed] on moving forward with CoSORT."  However, during the course of the negotiations with Syncsort, a Syncsort employee asked "where you need to be to move forward with Syncsort license in December." (Def's Tab 86.)  In response, the Barnes & Noble manager who signed the non-disclosure agreement with IRI sent Syncsort an email quoting verbatim from IRI's written price quote for CoSORT.  IRI claims that it was through this act that Syncsort induced a breach of IRI's non-disclosure agreement. Eventually, Barnes & Noble decided to purchase a SyncSort license. In support of the proposition that Syncsort knew about the non-disclosure agreement, IRI makes two arguments. First, it argues that Syncsort had been told by other customers that IRI entered into such agreements. Second, it argues that Syncsort at least should have been aware after the filing of the counterclaim which contained an allegation that Syncsort has interfered with these types of agreements which IRI had with "most" of its customers and the Barnes & Noble incident occurred after that date.

**NOT FOR PUBLICATION**

As an initial matter, the Court is not convinced that IRI has demonstrated that Syncsort had knowledge of the specific contract between IRI and Barnes & Noble. Even if Syncsort knew that "most" of IRI's customers sign such agreements, this does not establish that Syncsort was aware of this particular contract between IRI and Barnes & Noble. Linkco, Inc. v. Fujitsu Ltd., 230 F. Supp. 2d 492, 496-98 (S.D.N.Y. 2002) (granting judgment as a matter of law on a claim in which the plaintiff only presented evidence that non-compete agreements were "a matter of course" and "common practice" in the industry, but had not presented any evidence that the defendant had actual knowledge of the contract in question). However, even if Syncsort was aware of this specific contract, IRI has not established that Syncsort acted in any way outside the "rules of the game." Inquiring "where you need to be to move forward with the Syncsort licenses" cannot be viewed as anything more than a request by a competitor as to what it needs to quote to be competitive on a deal. It is not a request that Barnes & Noble breach its non-disclosure agreement with IRI and reveal IRI's price quote. This is a typical and acceptable tactic in healthy open-market competition, nothing more. Summary judgment is granted to Syncsort on the tortious interference with contract claim.

## C.    Tortious Interference with Prospective Economic Advantage

To state a claim for tortious interference with prospective economic advantage, "the plaintiff must demonstrate [1] some reasonable expectation of economic advantage, [2] that the defendant's actions were malicious in the sense that the harm was inflicted intentionally and without justification or excuse, [3] a reasonable probability that the plaintiff would have obtained the anticipated economic benefit and [4] that the injury caused the plaintiff damage." Weil v.

NOT FOR PUBLICATION

Express Container Corp., 360 N.J.Super. 599, 613-14 (App. Div. 2003) (citing Printing

Mart-Morristown v. Sharp Elec. Corp., 116 N.J. 739, 751-52 (1989)).

IRI advances the same Barnes & Noble example provided in the tortious interference with

contract claim to support this claim. This allegation also fails.  As discussed, IRI can not

establish that Syncsort's actions were "malicious in the sense that harm was inflicted

intentionally and without justification or excuse."  The actions that it complains of were within

the "rules of the game," and nothing more than healthy and legal competitive behavior. As such,

summary judgment is granted to Syncsort on the tortious interference with prospective economic

advantage claim.

      **D.**    **Unfair Competition**

IRI's unfair competition claim is based on its other counterclaims and has no independent

basis beyond those claims.  As discussed, the Court grants summary judgment in favor of

Syncsort on all of IRI's counterclaims.  Therefore summary judgment is also granted in favor of

Syncsort on the unfair competition counterclaim.

**IV.**    **MOTION TO STRIKE THE REPORTS AND PRECLUDE THE TESTIMONY OF THEODORE F. MARTENS**

In light of the Court's ruling granting summary judgment to IRI on Syncsort's damages

on the trade secret misappropriation claim and other claims, the Court does not need to decide

the issue of whether the report of the Syncsort's damages expert should be struck and his

testimony precluded.  The motion is denied as moot.  If necessary, IRI may revive this motion at

a later time.

NOT FOR PUBLICATION

## V.   MOTION TO STRIKE THE REPORTS AND PRECLUDE THE TESTIMONY OF ROGER M. MILIGRIM

On October 16, 2006, at the conclusion of discovery, within the deadline for serving

expert disclosures, IRI served the report of a liability expert, Professor Michael I. Shamos who

concluded that the SyncSort UNIX command language was not a trade secret because Syncsort

had not taken meaningful steps to keep the language confidential and that the language was

widely known. At that time, Syncsort also served a report of its own liability expert, Professor

Benjamin Goldberg. Goldberg offered no opinion of the public disclosure of the command

language or on whether the command language was a trade secret.

On the deadline for serving liability rebuttal reports, Syncsort offered a rebuttal report

from Goldberg as well as a first-time report of Roger Milgrim. Milgrim is a lawyer and the

author of a treatise entitled Milgrim on Trade Secrets. On January 12, 2007, IRI took Milgrim's

deposition.

IRI now moves to strike the report of Miligrim and preclude his testimony at trial to the

extent that it expresses legal opinions.  IRI also seeks an order *in limine* precluding Miligrim

from testifying beyond the two opinions that expressed in his opinion. According to IRI, those

two opinions are: (1) Syncsort protected the material in the Syncsort UNIX reference guide

through its licensing agreement, and (2) that the use of confidentiality legends as a means to

protect purported trade secrets in Syncsort's reference guide conforms with customary practice in

the computer industry. (Defs' Reply at 2.)

During oral argument Syncsort's counsel stated that he had no intention of soliciting

testimony of legal opinions from Miligrim at trial. (Hearing Tr. 69:8-18.)  Syncsort's counsel

explained that Miligrim was essentially being offered as a rebuttal witness to rebut the opinions

-37-

NOT FOR PUBLICATION

expressed by IRI's expert witness. As the Court has no reason to doubt counsel's representation, this portion of the motion is denied. If Miligrim does attempt to provide testimony as to legal opinions at trial, IRI may then object and make the necessary motions.

In response to IRI's request that this Court issue an order requiring Miligrim to limit his testimony to the two opinions identified by IRI, Syncsort's counsel stated that they are bringing Miligrim as an expert to testify to the sufficiency of the measures that Syncsort took to protect the secrecy of the command language and whether these fall within industry norms for trade secret protections. He stated that Syncsort would not want Miligrim's testimony limited to "particular measures A, B and C because there are ... four or five things mentioned in the body of Mr. Miligrim's report." (Hearing Tr. 69-70.)

"Absent surprise or bad faith, an expert may testify beyond the scope of his report." Wachtell v. Guardian Life Ins. Co., 239 F.R.D. 376, 389 (D.N.J. 2006); see also Bowersfield v. Suzuki Motor Corp., 151 F. Supp. 2d 625, 631 (E.D. Pa. 2001)("[T]estimony of an expert on matters within the expert's expertise but outside the expert's report is not only permissible at trial, but the exclusion of such testimony may be reversible error.")(citing DeMarines v. KLM Royal Dutch Airlines, 580 F.3d 1193 (1978)).  The factors to be considered by Court when deciding whether to exclude the testimony are: "(1) the prejudice or surprise in fact of the party against whom the excluded witnesses would have testified; (2) the ability of that party to cure the prejudice; (3) the extent to which waiver of the rule against calling unlisted witnesses would disrupt the orderly and efficient trial of the case or of other cases in the court; [and] (4) bad faith or willfulness in failing to comply with the court's order." DeMarines, 580 F.2d at 1201-02. Miligrim's expert report clearly puts IRI on notice that Miligrim is being offered as an expert

**NOT FOR PUBLICATION**

who will testify that the measures taken by Syncsort to protect the secrecy of its trade secret were in line with the measures commonly undertaken in the industry.  Additionally, this intent was affirmed by the Syncsort's opposition to the motion to strike Miligrim's report. It would not prejudice IRI if Miligrim were to provide additional examples of how those trade secrets were protected and whether these measures were in line with the protections typically utilized. IRI's motion is denied. However, if Miligrim were to offer testimony well beyond the scope of his report, IRI may object at that time and the Court will reevaluate.

## VI.    MOTION FOR RULE 11 SANCTIONS

Syncsort moves for sanctions against IRI and its counsel pursuant to Rule 11, Rule 26(g), 28 U.S.C. §1927, and the Court's inherent powers. Generally, Syncsort's allegation is that IRI's initial denials that it did not use the Reference Guide in developing the SSU2SCL convertor and insistence that it developed the convertor through the use of consumer scripts are sanctionable in light of the fact that it was later revealed that the person who actually developed the convertor, Rick Haines, had access to the Reference Guide and, while he did not remember one way or the other, "may have" used the Guide in developing the convertor. Further, Syncsort argues that IRI should have presented Mr. Haines as a witness at the preliminary injunction hearing, since he was the developer of the convertor and would have been able to provide the best testimony.

Syncsort asks the Court to award the following sanctions: (1) that IRI's Answer be stricken from the record, (2) that judgment be entered in favor of Syncsort on the Complaint, (3) that Syncsort be awarded attorneys fees and costs for the additional expenses incurred as a result of the misconduct, and (4) that IRI and the persons who testified falsely be referred to the appropriate law enforcement authorities. (Pl's Sanctions Mem. at 5.)

NOT FOR PUBLICATION

In its defense, IRI contends that the assertions made by counsel and IRI personnel regarding the Reference Guide were reasonable based on the investigation conducted by IRI and do not warrant sanctions. According to IRI, its counsel conferred with IRI's management and instructed management to ask the developer of the SSU2SCL convertor if he had used the Reference Guide in connection with the development of convertor.  Management then had a telephone conference with Mr. Haines during which they asked him if he had used the Guide. Mr. Haines responded that he had not used the Guide, but rather had relied upon consumer-written job control scripts provided to him by Ms. Strickland. (Def's Opp. to Sanctions Motion at 3.)  IRI further argues that none of the managers who questioned Mr. Haines had any reason to doubt him as they had never observed him using the manual. (Id. at 4.)  These findings were then reported to IRI's counsel who incorporated them into the briefing of the case. Furthermore, IRI argues that  these misstatements have not changed the course of the litigation, since the key issue is whether the SyncSort UNIX language was a trade secret not how IRI learned the language. IRI also argues that if the Court were to adopt the standard for sanctions advanced by Syncsort, Syncsort's own conduct is sanctionable, since it asserted that the scripting language was not publically available when in fact it was so on the Internet (as discussed in the context of the summary judgment motion). Finally, IRI points out that it issued a supplemental statement correcting its misstatements.  It was therefore inappropriate for Syncsort to file the motion for sanctions.[11]

_____

[11] On October 13, 2006, Syncsort served a draft version of the current Rule 11 motion on IRI. In response, November 13, 2006, IRI filed a supplemental statement with the Court which stated, in part:

> Based on the evidence available to it at the relevant times, IRI asserted at the January 2005 preliminary-injunction hearing, in post-hearing briefing, in its answer and in conferences with the magistrate judge that there was no evidence to support the

**NOT FOR PUBLICATION**

### A.      Rule 11

Under Rule 11, the Court may impose sanctions on the parties or their attorneys if they

have violated subdivision (b) of the Rule. Fed. R. Civ. P. 11(c). An attorney must certify that "to

the best of [his or her] knowledge ... formed after an inquiry reasonable under the circumstances"

that: (1) papers submitted to the court are not "not being presented for an improper purpose, such

as to harass or to cause unnecessary delay or needless increase in the cost of litigation"; (2) "the

claims, defenses, and other legal contentions therein are warranted by existing law or by

nonfrivolous arguments for the extension, modification, or reversal of existing law or the

establishment of new law"; (3) "the allegations or other factual contentions have evidentiary

support"; and (4) "the denials of factual contentions are warranted on the evidence or, if

specifically so identified, are reasonably based on a lack of information or belief." Fed. R. Civ. P.

11(b). While generally Rule 11 sanctions are imposed on the attorney, under certain

circumstances, it may be appropriate to impose sanctions on the client. See Advisory Committee

Notes, Rule 11, 1983 Amendment.

"The legal standard to be applied when evaluating conduct allegedly violative of Rule 11

is reasonableness under the circumstances."  Ford Motor Co. v. Summit Motor Prods., Inc., 930

---

contention that the designer of IRI's product, SSU2SCL, referred to a SyncSort UNIX
manual when he designed SSU2SCL.
*Since IRI made those assertions, it has learned that there is evidence that could support
the proposition that the designer of SSU2SCL made modest reference to material that
can be found in the SyncSort UNIX manual when he designed SSU2SCL.* Accordingly,
IRI offers this correction to its previous filings and oral statement that asserted that the
designer of SSU2SCL did not refer to the SyncSort manual when he designed SSU2SCL.
*The designer has now testified that he might have referred to the SyncSort manual and,
so, IRI acknowledges that he might have done so and withdraws its previous statements
that he definitively did not.*
(Def's Supp. Statement at 1-2 (Tab 102), emphasis added.)

**NOT FOR PUBLICATION**

F.2d 277, 289 (3d Cir. 1991)(citing <u>Bus. Guides v. Chromatic Commc'ns Enter., Inc.</u>, 498 U.S. 533, 546-47 (1991)). Reasonableness in the context of Rule 11, is "an objective knowledge or belief at the time of the filing of the challenged paper that the claim was well-grounded in law and fact." <u>Id.</u>  Subjective good faith on the part of the attorney is insufficient to avoid sanction. <u>See</u> <u>Gaiardo v. Ethyl Corp.</u>, 835 F.2d 479, 482 (3d Cir. 1987)("[T]he Rule does not permit use of the 'pure heart and empty head defense.'"). An attorney must "Stop, Think, Investigate and Research before filing papers either to initiate a suit or to conduct the litigation." <u>Id.</u> at 482; <u>see also</u> <u>Becker v. Sherwin Williams</u>, 717 F. Supp. 288, 296-97 (D.N.J. 1989). However, "[t]he court is expected to avoid using the wisdom of hindsight and should test the signer's conduct by inquiring what was reasonable to believe at the time the pleading, motion, or other paper was submitted." Advisory Committee Notes, Rule 11, 1983 Amendment.  Sanctions are appropriate only if "the filing ... constituted abusive litigation or misuse of the court's process."  <u>Simmerman v. Corino</u>, 27 F.3d 58, 62 (3d Cir. 1994).

Rule 11 contains a "safe harbor" provision which requires that the motion be "served... but shall not be filed with or presented to the court unless, within 21 days after service of the motion (or such other period as the court may prescribe), the challenged paper, claim, defense, contention, allegation or denial is not withdrawn or appropriately corrected." Fed. R. Civ. P. 11(c)(1)(A).

Based on the description provided by IRI's counsel of the investigation conducted at the early stages of this litigation, it appears to have been objectively reasonable for IRI's counsel to represent to the Court that IRI did not use the Reference Guide to develop the SSU2SCL converter. The Court has no reason to disbelieve the description of the investigation provided by

NOT FOR PUBLICATION

IRI's counsel.  The inquiry seems in line with how investigations into the defense of a lawsuit are

typically conducted – IRI's counsel spoke with the key management personnel at IRI and asked

them to speak to the key people involved in the facts underlying the lawsuit.  IRI's management

spoke with Mr. Haines who had developed the converter while he was an intern in 2000, four

years before the filing of the lawsuit. Mr. Haines either mis-represented or failed to remember

whether he had used the Reference Guide. However, this conduct does not warrant sanction

under Rule 11. Clearly, had IRI's counsel made those representations today, knowing that Mr.

Haines "may have" used the Reference Guide, such conduct would be sanctionable.  However

the Court should not use the "wisdom of hindsight" in its determination whether to sanction IRI

and its counsel. IRI corrected these representations in its Supplemental Statement.  The Court has

no reason to award Rule 11 sanctions.

    **B.**    **Rule 26(g)**

    Similar to Rule 11, Rule 26(g) requires that attorneys sign disclosures, discovery request,

responses and objections and "certif[y] that to the best of the signer's knowledge, information,

and belief, formed after a reasonable inquiry, the disclosure is complete and correct as of the time

it is made." Fed. R. Civ. P. 26(g)(1).  The Rule permits the court, upon motion or upon its own

initiative, to impose sanctions, including reasonable attorney's fees for violations of the rule. Fed.

R. Civ. P. 26(g)(3).

    The investigation conducted by IRI's counsel was sufficient for counsel to believe that the

information disclosed was correct. There are no grounds to sanction IRI's counsel pursuant to

Rule 26(g).

**NOT FOR PUBLICATION**

**C.      28 U.S.C. § 1927**

28 U.S.C. §1927 provides that "[a]ny attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct." 28 U.S.C. § 1927.

The primary purpose of 28 U.S.C. § 1927 is to deter intentional and unnecessary delay. See In re Cendent Corp. Derivative Action Litig., 96 F. Supp. 2d 404, 408 (D.N.J.2000)(Walls, J.) (citing Zuk v. Eastern Pa. Psychiatric Inst., 103 F.3d 294, 297 (3d Cir.1996)). To impose sanctions under § 1927 , a court must find (1) a multiplication of proceedings by an attorney; (2) by conduct that can be characterized as unreasonable and vexatious; with (3) a resulting increase in the cost of proceedings; and (4) bad faith or intentional misconduct. See id. (citing Williams v. Giant Eagle Markets, Inc., 883 F.2d 1184, 1191 (3d Cir. 1989)).

As with Rule 11 sanctions, there is no reason to sanction IRI under 28 U.S.C. § 1927. As an initial matter, it is unclear whether the litigation would be in a different stage even if IRI had conceded that it used the Reference Guide. Even with the concession made in IRI's Supplemental Statement that its developer made "modest use" of the Guide, Syncsort has not moved for summary judgment on its complaint. This Court's grant of summary judgment to IRI on the majority of Syncsort's claims further underline the fact that Syncsort's case would have been no more successful even if IRI had initially admitted that it made modest use of the Reference Guide to develop the convertor.  This does not appear to be a circumstance when IRI's counsel "unreasonably and vexatiously" multiplied the proceedings. As discussed, it was reasonable for

**NOT FOR PUBLICATION**

IRI's counsel to accept the representations made by IRI regarding the use of the Reference Guide.

There are no grounds which warrant sanctioning IRI, or its counsel, pursuant to 28 U.S.C. §

1927.

> **D.     Court's Inherent Powers**

The Court also has the inherent power to impose a variety of sanctions it deems

appropriate in a particular case for abuses of the judicial process. See Chambers v. Nasco, Inc.

501 U.S. 32 (1991). "These powers are 'governed not by rule or statute but by the control

necessarily vested in courts to manage their own affairs so as to achieve the orderly and

expeditious disposition of cases.'" Id. at 43 (quoting Link v. Wabash R. Co., 370 U.S. 626,

630-631 (1962)). The Supreme Court in Chambers recognized that this power included the

ability to impose sanctions ranging from the imposition of attorneys fees to the "outright

dismissal of a lawsuit." Id. at 43-45.

For the reasons discussed in the analyses of the other forms of sanctions requested by the

plaintiff, the Court finds no need to sanction IRI or its counsel under its inherent powers.

Syncsort's motion for sanctions is denied in its entirely.

**NOT FOR PUBLICATION**

**VII.    CONCLUSION**

For the foregoing reasons, IRI's motion for summary judgment is denied with respect to the trade secret misappropriation claim but granted with respect to damages on this claim. The motion is denied as to the unjust enrichment claim and granted as to all of Syncsort's other claims. Syncsort's motion for summary judgment on IRI's counterclaims is granted.  IRI's motions to strike the expert reports and preclude the testimony of Martens and Miligrim are denied. Syncsort's motion for sanctions is denied.


                                                    s/William H. Walls
                                        United States Senior District Judge

**Appearances**

Ronald Abramson, Esq.
Hughes Hubbard & Reed, LLP
101 Hudson Street, Suite 3601
Jersey City, New Jersey 07302-3918

Jeff Galloway, Esq.
Hughes, Hubbard & Reed LLP
One Battery Park Plaza
New York, NY 10004
            Attorneys for Plaintiff Syncsort

David Fine, Esq.
Mark D. Marino, Esq.
Kirkpatrick & Lockhart Preston Gates Ellis LLP
17 North Second Street, 18th Floor
Harrisburg, PA 17101
            Attorneys for Defendant IRI