**NOT FOR PUBLICATION**

### UNITED STATES DISTRICT COURT
### DISTRICT OF NEW JERSEY

———————————————————

SYNCSORT INCORPORATED,  :
  :
              Plaintiff,  :
  :                            **OPINION and ORDER**
          v.  :
  :                            Civ. No. 04-3623 (WHW)
INNOVATIVE ROUTINES,  :
INTERNATIONAL, INC.,  :
  :
              Defendant.  :
———————————————————

**<u>Walls, Senior District Judge</u>**

  This lawsuit involves a dispute between two competitors, Syncsort Incorporated and

Innovative Routines International, Inc. (known as "IRI"), which develop and sell data

transformation software.  Data transformation is the process of taking data in one form and

changing into another form (such as editing or reordering the data). Syncsort produces and

licenses a data transformation software product called SyncSort UNIX. IRI markets a directly

competing product called CoSORT.

  Users of the software are able to write and save job-control scripts, which are sequences

of instructions and commands for particular data transformation tasks. The scripts are reusable,

so users do not have to rewrite the scripts for each task they wish to perform.

The job-control scripts are written in a command language that is unique to the respective software product.  The CoSORT command language is incompatible with SyncSort UNIX, and the SyncSort UNIX command language is incompatible with CoSORT.

The incompatibly between the two command languages creates a significant barrier to switching software vendors because creation of new scripts is a costly endeavor. If a customer decides to switch software products, the customer must recreate its job-control scripts so that they are compatible with the new software.

In response to this barrier to switching products, IRI developed a computer program—ssu2scl—which can translate scripts written in the SyncSort UNIX command language into the CoSORT command language. This translator allows SyncSort UNIX customers to switch to CoSORT without going through the effort of rewriting job-control scripts.

Syncsort has twice sued IRI in this Court alleging, among other claims, misappropriation of trade secrets and unfair competition; Syncsort seeks injunctive relief and damages. The first suit resulted in a bench trial and the fact findings and legal conclusions that follow.

Earlier, the Court had decided motions for summary judgment. The Court ruled that Syncsort's trade secret misappropriation and unfair competition claims could proceed to trial. Although Syncsort's demand for monetary damages was struck because there was no evidence to support a causal link between IRI's use of the translator and the monetary damages claimed by Syncsort.

The Court has reviewed the parties' proposed findings of fact and conclusions of law against the backdrop of the Court's notes, recollection and trial transcripts. Notwithstanding the micro-factual submissions of the parties, the Court believes and finds many submissions to be irrelevant, hyperbolic rhetoric, and not necessary to the Court's ultimate conclusions.

This opinion has concentrated on the material and supportive facts necessary to answer the primary questions: Is information sufficient to create the ssu2scl translator a recognizable trade secret? If so, did IRI misappropriate this trade secret? And, is Syncsort entitled to an injunction?

The Court has evaluated the credibility of all witnesses testing not only what they said but how they said it and what was not said against these criteria: Was this more likely so or not? Did what was said make sense in the totality of circumstances? To the extent any finding of fact reflects a legal conclusion, it shall be to that extent deemed a conclusion of law, and vice versa.

## FINDINGS OF FACT

### A. Background

1.      The plaintiff is Syncsort Incorporated, a New Jersey corporation with its principal offices in Bergen County, New Jersey. PTO Stip. ¶ 1.

2.      The defendant is Innovative Routines International, Inc., a Florida corporation with its principal offices in Brevard County, Florida. PTO Stip. ¶ 2.

3.      Syncsort is a developer and vendor of high-performance software for corporate data processing customers. PTO Stip. ¶ 5.

4.      Syncsort develops and licenses data transformation software. Data transformation is the process of taking data, transforming and integrating it into another form to be used or further processed. Trial Tr. 57:5-57:11, 58:21-58:24, Jan. 19, 2011.

5.      In 1993, Syncsort introduced SyncSort UNIX, which is data transformation software for the UNIX computer operating system. PTO Stip. ¶¶ 5-6.

6.     SyncSort UNIX customers have large amounts of data to transform and are generally large institutions such as banks, investment companies, life insurance companies, government institutions and universities. Trial Tr. 470:23-471:4, May 10, 2011.

7.     Syncsort relies in part on trade secret protection to maintain the proprietary nature of its software products, including SyncSort UNIX. Trial Tr. 70:17-71:1, Jan. 19, 2011.

8.     Defendant IRI is a software company that competes with Syncsort in the data transformation software market segment. IRI markets CoSORT, a software product which competes directly with SyncSort UNIX. PTO Stip. ¶ 14. In this market segment, there are approximately twelve companies that offer products that compete with Syncsort's products. Trial Tr. 266:19-266:24, Jan. 21, 2011.

**B.  Development of SyncSort UNIX and the Reference Guide**

9.     Syncsort designed SyncSort UNIX so that a user could use the product by giving it commands coded in a particular command language. The SyncSort UNIX command language is an extensive symbolic system by which a user instructs the SyncSort UNIX program to perform specific data processing and sorting jobs. The language is comprised of (i) words and symbols that have particular meaning within the language ("options" and "keywords") (the respective meanings of which are referred to as the language "semantics"), and (ii) the specific rules or "syntax" for forming valid program expressions out of those options and keywords. PTO Stip. ¶¶ 9, 11.

10.    SyncSort UNIX cannot perform the tasks desired by the user unless the command language statements used to invoke those tasks are specified correctly in accordance with the syntax and semantics of the language. *See* Pl. Ex. 584 ¶ 10.

11.    The SyncSort UNIX command language is not generally known to others (unauthorized users and competitors) in the computer industry. Trial Tr. 58:13-58:15, Jan. 19, 2011.

12.    SyncSort UNIX command language statements are particularly useful when used in combination, to perform a set of data transformation tasks that comprise a practical data processing task that the user wishes to perform. SyncSort UNIX users are able to create and save such a series of instructions for their particular data transformation jobs as text files. Such text files are called job-control scripts. These scripts consist of a series of statements that include options, keywords and user-supplied names and data, each arranged in accordance with the syntax of the language. The scripts save users the labor of physically entering the text of their desired commands line by line for each of their jobs and eliminate associated typing errors. These scripts are often run repetitively in a commercial data processing department. It is a practical necessity, therefore, to have the specifications for SyncSort UNIX data transformation jobs stored in the form of scripts. PTO Stip. ¶ 13; Trial Tr. 195:1-195:21, Jan. 20, 2011.

13.    Syncsort developed the SyncSort UNIX Reference Guide that defines commands, parameters and syntax and formal grammar definitions of the SyncSort UNIX command language. PTO Stip. ¶¶ 10-12. The Reference Guide is nearly 400 pages. Pl. Ex. 114

14.    The Reference Guide describes the syntax of the SyncSort UNIX command language in a comprehensive series of precise, formal definitions which, together, are known as a grammar. PTO Stip. ¶ 12. The Reference Guide sets out the rules for each "option" or "statement" in the language. In addition, there are other sections of the Reference Guide concerning program usage, and an extensive appendix that defines numerous keywords, specifies

acceptable data types for various operations, and sets forth additional technical details concerning the language. *See generally* Pl. Ex. 114.

15.     Syncsort invested over $13 million to develop SyncSort UNIX and the SyncSort UNIX command language approximately between 1992 and 2005. *See* Trial Tr. 481:3-481:16, May 10, 2011.

16.     Before developing SyncSort UNIX, Syncsort had developed several mainframe computer versions of SyncSort. One such version, SyncSort MVS, was developed for the MVS mainframe operating system and was based on the sort language for IBM's DFSort, which is in the public domain. Trial Tr. 154:12-155:15, Jan. 20, 2011. The SyncSort UNIX command language is quite different from the languages that Syncsort created for use with its mainframe-based software, including SyncSort MVS. Trial Tr. 333:22-334:3, Jan. 21, 2011; Trial Tr. 155:4-155:6, Jan. 20, 2011. A full knowledge of the Syncsort MVS command language would not permit one to write a translator for SyncSort UNIX. Trial Tr. 333:25-334:3, Jan. 21, 2011.

17.     In 1990, 1991 and 1992, IRI developed a command language for CoSORT known as SortCL. PTO Stip. ¶ 15. The SortCL command language has always been incompatible with SyncSort UNIX, just as the SyncSort UNIX command language is incompatible with CoSORT. PTO Stip. ¶ 21.

18.     The SyncSort UNIX command language and IRI's SortCL each require that instructions be provided to them in precisely defined structures, in accordance with the term definitions and syntax of their respective command languages. Neither program has "artificial intelligence" capabilities to try to guess what a user intends. If the desired instructions are not stated in the correct form, the program will either fail or provide incorrect results. The proper

"form" for these instructions is the form specified by the command language for the program. PI Hr'g Tr. 73:13-73:17, Jan. 4, 2005; PI Hr'g Tr. 38:15-38:20, Jan. 5, 2005.

19.      Due to the specificity of the formal language requirements of SyncSort UNIX and the arbitrary nature of many of the words, symbols and syntax Syncsort selected in developing the SyncSort UNIX command language, it would be difficult for a computer programming company in the same industry as Syncsort to recreate the grammar of SyncSort UNIX from general knowledge of the industry without having access to the SyncSort UNIX Reference Guide, even if the developer had access to scripts written in the SyncSort UNIX language. Trial Tr. 331:6-332:11, Jan. 21, 2011.

**C.  Measures Used to Protect the Secrecy of the SyncSort UNIX Command Language**

20.      There is a custom in the software industry of keeping software intended for commercial use and all related materials protected by confidentiality agreements and trade-secret status. Trial Tr. 69:2-70:3, Jan. 19, 2011. Such is evident in use of legends on software manuals, use of non-disclosure agreements and contractual provisions with end users, resellers and other parties. The industry understands these legends and agreements to restrict one from using or disclosing information related to the software in an unauthorized manner. Trial Tr. 349:12-350:1, 350:8-350:25, Jan. 21, 2011.

21.      Since creating its SyncSort UNIX command language in the early 1990s, Syncsort has taken precautions to prevent any detailed information concerning the elements and workings of the command language from becoming publicly known. Trial Tr. 104:3-105:8, Jan. 20, 2011. Some of the precautions and measures taken to protect the trade secret nature of the SyncSort UNIX command language include:

i.   Requiring all users, including those who use SyncSort UNIX on a trial basis, to enter into a license agreement that restricts the use of SyncSort

UNIX and its related manuals and materials and binds the licensee to maintain the confidentiality of "any information" related to SyncSort UNIX. Trial Tr. 468:23-469:16, May 5, 2011; Trial Tr. 104:15-104:17, Jan. 20, 2011; Pl. Ex. 441 ¶ 4.

ii. Requiring all Syncsort employees (including clerical employees), contractors or business partners to execute confidentiality agreements that forbid such parties to copy, remove from Syncsort's premises, or disclose to anyone outside Syncsort's direct employ, any information considered confidential, including software documentation without prior written approval by a vice president of Syncsort. Trial Tr. 104:3-104:8, Jan. 20, 2011; Pl. Ex. 469; Pl. Ex. 584¶ 14(c). Syncsort has also made clear to employees in its technical support group who assist customers with SyncSort UNIX that they are to keep the SyncSort UNIX language confidential. Trial Tr. 404:11-404:21, Jan. 25, 2011.

iii. Requiring all SyncSort UNIX resellers and distributors to enter into a Reseller Agreement containing confidentiality provisions that bind the reseller or distributor, its customers and its employees. Trial Tr. 108:9-108:13, Jan. 20, 2011; Pl. Ex. 470; Pl. Ex. 584 ¶ 14(d). The Reseller Agreement serves to ensure that resellers and distributors and their employees keep information, such as software documentation, confidential, and that they do not disclose such information to any third party without Syncsort's prior written approval. *See, e.g.*, Pl. Ex. 470 § 3 ¶¶ 1.3, 1.6; § 4 ¶¶ 1.1, 12.3, 16.2, 16.3, 19.6.

iv. Placing confidentiality legends on all printed and machine readable materials related to SyncSort UNIX, including the Reference Guide Trial Tr. 104:23-105:2, Jan. 20, 2011; Pl. Ex. 584 ¶ 14(b); Pl. Ex. 114.

v. Taking measures, including the use of a firewall, to prevent outsiders from obtaining access to Syncsort's internal computer network. Trial Tr. 104:12-104:14, Jan. 20, 2011.

vi. Utilizing a software key mechanism that links a specific server to each licensee to prevent SyncSort UNIX from being run on any unlicensed server. Trial Tr. 104:18-104:22, Jan. 20, 2011.

**D.  Translation and ssu2scl**

22.      Data transformation software is generally licensed either for a set term or in perpetuity. Term licensees generally receive maintenance and support during the term, whereas perpetual licensees typically sign renewable maintenance agreements. Trial Tr. 71:15-73:2, Jan. 19, 2011.

23.      Syncsort sells term licenses. IRI sells perpetual licenses.

24.      Customers may switch from one software product to another at anytime. But, they may be dissuaded from doing so because of the cost of translating job-control scripts from the command language of one software product to another.

25.      The incompatibly between the two command languages creates a significant barrier to switching software vendors because creation of new scripts is a costly endeavor.  If a customer decides to switch software products, the customer must recreate its job-control scripts to be compatible with the new software.

26.      In response to this barrier to switching products, in 2000, IRI developed a computer program—ssu2scl—which can translate scripts written in the SyncSort UNIX command language into the CoSORT command language.  This translator allows SyncSort UNIX customers to switch to CoSORT without going through the effort of rewriting job-control scripts.

27.      The trade secret status of the SyncSort UNIX command language is of great value to Syncsort because it prevents competitors from using that language to lure away Syncsort's customers. Where a customer has hundreds of scripts that must be made compatible with a competing software product, the cost of script conversion is a key consideration in evaluating the overall cost of switching to a competing product. Trial Tr. 76:7-76:19, Jan. 19, 2011.

Additionally, the cost associated with making SyncSort UNIX scripts compatible with a competing product may prevent Syncsort's current customers from using the threat of taking their scripts elsewhere as a bargaining chip in license renewal negotiations. Trial Tr. 79:22-81:24, Jan. 19, 2011.

28.     Eliminating the SyncSort UNIX command language's trade secret status would increase competitors' ability to sell their own products to existing SyncSort UNIX customers. *See* R. Friedland Dep. 209:20-209:24, 210:8-210:11, May 16, 2006 (ssu2scl can be "an important aid in IRI's ability to sell CoSORT to SyncSort customers"). Allowing Syncsort's competitors to disregard the trade secret status of the SyncSort UNIX command language would allow competitors to reverse engineer, translate, and otherwise incorporate that language into competing products.

29.     IRI has admitted that it provides the "useful" service of "convert[ing] [Syncsort customers' scripts] in an accurate way and in a timely way" before their SyncSort UNIX license periods ended. PI Hr'g Tr. 4:4-4:20, Jan. 5, 2005.

30.     From May to July of 2000, IRI developed a computer program that was capable of translating scripts written in the SyncSort UNIX command language into scripts in the SortCL command language. This followed an earlier, unsatisfactory attempt by IRI to develop such a utility (ss2scl). The translation program developed as a result of IRI's effort is called ssu2scl. The creation of ssu2scl required extensive knowledge of the proprietary SyncSort UNIX command language. Trial Tr. 213:3-213:22, Jan. 20, 2011. IRI also developed a utility called rescript that would automatically run CoSORT on the SyncSort UNIX script that had been translated by ssu2scl. Haines Dep. 12:15-12:18, 13:1-13:7, 111:11-111:15, May 13, 2005. IRI

distributes ssu2scl and rescript as a standard component in the CoSORT software package. PTO Stip. ¶ 20.

31.     Rick Haines, the programmer who wrote ssu2scl and rescript, relied on two sources of information to learn the SyncSort UNIX command language: the SyncSort UNIX Reference Guide and SyncSort UNIX scripts. Haines Dep. May 13, 2005, 15:13-15:20; Trial Tr. 171:18-172:2, Jan. 20, 2011. Haines's primary source of knowledge of the grammar of the SyncSort UNIX command language was the SyncSort UNIX Reference Guide. Haines used scripts to test the effectiveness of ssu2scl and rescript after he created these utilities by copying information from the Reference Guide.

32.     Notwithstanding earlier denials, IRI, through its counsel, conceded that it had access to and used the Reference Guide to develop ssu2scl. Trial Tr. 171:18-172:2, Jan. 20, 2011.

33.     Certain translation mechanisms in the ssu2scl source code tracked the Reference Guide word-for-word. This tracking was not a coincidence. The source code demonstrates that IRI took significant parts of its translator code from the definitions of SyncSort UNIX command language as they were specifically set out in the Reference Guide. Trial Tr. 201:16-203:16, Jan. 20, 2011.

34.     In late 1997 or early 1998, IRI obtained a copy of the SyncSort UNIX Reference Guide dated 1996 from an unspecified Brazilian distributor, instead of receiving a copy from Syncsort or another authorized source. PI Hr'g Tr. 19:19-19:25, 59:11-59:19, Jan. 5, 2005; Pl. Ex. 114. IRI later characterized the source as a reseller and claimed that it could not provide any further details concerning the circumstances of how IRI obtained the Guide. D. Friedland Dep. 292:14-292:20, May 19, 2006.

35.     On the same page that identified the year that IRI's copy of the Reference Guide was published, there is an explicit statement that the Reference Guide, like all versions of the Reference Guide, is a confidential document for use only by licensees. *See* Pl. Ex. 114. Specifically, page 2 of the copy of the Reference Guide in IRI's possession contains the following legend:

> This document contains proprietary and confidential material, and is only for use by lessees of the SyncSort proprietary software system. This publication may not be reproduced in whole or in part, in any form, except with written permission from Syncsort Incorporated.

Pl. Ex. 114.

36.     It is accepted practice in the computer software industry to treat all software manuals bearing confidentiality notices as confidential. Trial Tr. 348:25-350:1, 295:5-295:16, Jan. 21. 2011; Pl. Ex. 60 (IRI's Co-SORT Manual bears a similar confidentiality notice). IRI used the copy of the Reference Guide that it obtained for the purpose of creating ssu2scl and for otherwise improving IRI's script conversion capabilities in order to take away Syncsort's customers.

37.     The Reference Guide was readily available to Haines because Susan Strickland (an IRI product tester) kept the guide in the office's library. Strickland Dep., 149:21-150:6, May 17, 2006. Strickland herself used the Reference Guide to help her understand certain details of SyncSort UNIX when creating a SortCL version of SyncSort UNIX scripts. PI Hr'g Tr. 60:21-61:11, Jan. 5. 2005; Strickland Dep. 214:25-215:8; 216:11-216:8, May 17, 2006.

38.     IRI relied upon the Reference Guide to learn the syntax of the SyncSort UNIX command language. This allowed IRI to create ssu2scl as well to have a resource when IRI needed to understand certain SyncSort UNIX proprietary commands when it manually converted

SyncSort UNIX scripts into SortCL. IRI, more likely than not, could not have developed ssu2scl without the Reference Guide.

39.     IRI sought to and did obtain as many scripts from SyncSort UNIX customers as it could in order to create a means to test the effectiveness of ssu2scl and make improvements to it. By the time that IRI began to develop ssu2scl, it had collected between ten and 100 SyncSort UNIX scripts from customers, which IRI states that it used in its initial development of the translator. IRI, however, continued to try to improve and refine the translator as it obtained more and more scripts. Haines Dep. 15:13-20, 16:9-16:25;18:21-18:23, 118:13-118:19, May 13, 2005; *see also* Strickland Dep. 207:15-207:16, May 17, 2006 (IRI improved ssu2scl to translate customer's additional SyncSort UNIX scripts).

40.     That scripts may contain proprietary information belonging to SyncSort UNIX licensees regarding the business processes of those licensees does not negate the fact that these same scripts also contain trade secret information belonging to Syncsort, which those licensees have agreed by contract to keep confidential.

41.     As noted, ssu2scl's only purpose is to translate scripts written in the SyncSort UNIX command language to SortCL so that the resulting output is the same. Haines Dep. 13:1-13:7, May 13, 2005. IRI's president conceded that the only reason to create such a translator is to compete. PI Hr'g Tr. 44:19-44:22, Jan. 5, 2005. IRI's manifest purpose in developing ssu2scl and rescript was to lure Syncsort's customers by creating an artificial one-way cross-compatibility between the two programs. There was a companywide discussion by "[e]verybody" at IRI that IRI needed a working translation program. Strickland Dep. 137:7-137:15, May 17, 2006; P. Friedland Dep. 50:22-50:25, June 21, 2006.

42.      IRI's president, Paul Friedland, admitted that the translator that IRI developed was useful for converting SyncSort UNIX customers to CoSORT in precisely the way that IRI had originally envisioned: "if [a SyncSort UNIX customer] has hundreds [or] thousands of scripts, if he is looking at our product as a conversion tool, he needs to convert them in an accurate way and in a timely way. . . . if he didn't have such a tool, he couldn't do it. He certainly couldn't do it in this time frame required before [the customer's five-year SyncSort UNIX license expired]." PI Hr'g Tr. 4:4-4:20, Jan. 5, 2005.

43.      Although IRI claims that only a "handful" of IRI customers use ssu2scl, David Friedland, IRI's Vice President, admitted that IRI "considered this utility to be important," and that these customers are a "significant share" of IRI's business. D. Friedland Dep. 312:14-313:1; 313:6-313:13; 313:23-314:1; 315:20-315:22, May 19, 2006. Lisa Mangino, IRI's employee responsible for selling CoSORT, estimated that fifty percent of IRI's customers were SyncSort licensees. Mangino Dep. 32:18-32:25, May 15, 2005.

44.      IRI markets CoSORT, in combination with ssu2scl, as a replacement for SyncSort UNIX. When this lawsuit began IRI's website stated: "Notice to Other Sort Users. CoSORT . . . includes . . . conversion utilities, including ***rescript*** and ***ssu2scl***, to automatically replace and/or convert (respectively) SyncSort job specification files on UNIX systems and improve sort performance." Pl. Ex. 442-2.

45.      IRI's website advertised both ssu2scl's ability to make SyncSort UNIX scripts "run in CoSort instead" as well as IRI's ability to "assist [the customer] in that [script conversion] process":

Challenge:

A SyncSort UNIX . . . user wants to use CoSort . . . to . . . convert[] certain job scripts he/she wrote for SyncSort UNIX . . . to run in CoSort instead.

Solution:

The free conversion tool, SSU2SCL, can translate many basic job scripts in SyncSort UNIX syntax so you can automatically convert them for use in the CoSort package's Sort Control Language (SortCL) program. For more advanced SSU scripts, it is possible for you to translate them by hand, or for IRI to assist you in that process.

Pl. Ex. 552.

46.     IRI also published a document titled Legacy Sort Migration: Upgrading to

CoSORT which states:

In addition to script conversion, CoSORT also features drop-in replacement facilities for near-term SyncSort UNIX lease expiry situations . . . . With such plug 'n' play facilities, there is no impact on front-end applications -- existing sort application scripts stay in place so that operations can continue without any migration effort.

Pl. Ex. 448.

47.     As of trial, IRI continued to revise and update this document. Trial Tr. 485:19-

487:2 May 10, 2011; Pl. Ex. 712.

48.     IRI employees tasked with facilitating SyncSort UNIX conversions (including

Strickland, Haines and Rob Friedland) obtained knowledge of the SyncSort UNIX command

language from some source that had access to Syncsort's confidential information. It is more

likely than not that they, and IRI, knew that both the SyncSort UNIX scripts and the Reference

Guide in IRI's possession were disclosed to IRI in breach of a Syncsort confidentiality agreement.

49.     Once IRI finally succeeded in creating a usable translator, ssu2scl, IRI used it to convert the SyncSort UNIX scripts of a significant number of prospective customers, some of whom had hundreds of scripts that required conversion.

50.     IRI has used ssu2scl to take Syncsort customers: Bank of America, Innovata, Embratel, El Corte Ingles and HSBC in Brazil all worked with IRI to convert their SyncSort UNIX scripts to CoSort scripts using the ssu2scl translator. *See, e.g.*, Pl. Exs. 359, 130-8, 524-413, 217, 139, 220, 266, 386, 482-24, 212; Strickland Dep. 187:24-188:10, May 17, 2006.

51.     In spring, 2004, Syncsort management learned that IRI was promoting the capability of its CoSORT product "to automatically replace and/or convert (respectively) SyncSort job specification files on UNIX systems and improve sort performance." Pl. Ex. 442-2. Syncsort sued IRI in July 2004 and sought a preliminary injunction.

**E. Internet Postings of the SyncSort UNIX Command Language**

52.     After Syncsort sued IRI and sought a preliminary injunction against further use of ssu2scl, IRI searched the publicly available resources for any and all references to the SyncSort UNIX command language; it produced the following in opposition to Syncsort's preliminary injunction motion in January 2005:

(i)      A two-page "Technical Specification" for an earlier version of SyncSort UNIX;

(ii)     A document labeled "Technical Bulletin #005 – Syncsort – Sample Job 1" by David Weigel, and posted on the Millersville University website in violation of Millersville's license agreement with Syncsort; and

(iii)    A document called "Syncsort Application Guidelines," written by Paul Boal and posted on his personal website;

(iv)    A handful of very brief discussions of SyncSort UNIX on a web site called IT Toolbox. Pl. Ex. 426-26.

PI Hr'g Tr. 62:25-63:3, Jan. 4, 2005; PI Hr'g Tr. 67:19-67:25, 69:9-70:21, 71:12-72:12, 73:22-74:25, 76:10-77:1-78:3, Jan. 5, 2005. Before this lawsuit, IRI had not looked for any of these materials on the Internet. PI Hr'g Tr. 69:13-69:15, Jan, 5, 2005.

53.    These references, considered alone or in combination, do not nullify a trade secret status of the SyncSort UNIX command language:

(i)    The SyncSort UNIX Release 1 Technical Specification is a marketing document that tells a user what SyncSort UNIX can do, but not how the language does it. It does not define any of the language syntax. While it describes the general function of a number of program "option" words, it does not mention or define any of the more than 100 "keywords" listed in the index at page I.6 of the Reference Guide. *See* PI Hr'g Tr. 64:3-66:10, Jan. 4, 2005.

(ii)    The "Millersville College" (Weigel) Internet document describes one SyncSort UNIX script posted on the Internet without Syncsort's knowledge or permission and has since been removed. PI Hr'g Tr. 111:1-111:22, Jan. 5, 2005; Pl. Ex. 584 ¶ 24; Def. Ex. 6.

(iii)    The "Paul Boal" Internet paper is a document explaining some aspects of SyncSort UNIX scripting, which was published on Paul Boal's personal web site. It contains four pages of simplistic sample scripts. Boal is not and has never been an employee, agent or representative of Syncsort, nor otherwise affiliated with Syncsort in any way. Syncsort had never approved such posting or Boal's use of the Syncsort logo on the cover of his paper. Shortly after this paper came to Syncsort's attention during the hearing on January 5, 2005, its personnel contacted Boal and asked him to remove the paper from his Internet site. It has been removed. Pl. Ex. 584 ¶ 23; Def. Ex. 5.

(iv)    IT ToolBox forum discussions are each brief discussions from 2004 that address one or two minute aspects of the scripts characterized by repeated suggestions by a Syncsort employee, Gary Spaulding, to "contact technical support" and culminating in Spaulding expressly instructing a forum participant that had posted command language syntax that "since the syntax is proprietary to the company and intended for licensed users only, we would appreciate it if SyncSort syntax was not posted to public forums. Licensed users who need help with the specific

17

of the syntax, can always call us." Pl. Ex. 426-26. Spaulding responded to these three customer questions and did so at the request of Syncsort who asked him to monitor the forum and redirect its customers to Syncsort technical support. Trial Tr. 406:9-406:15, Jan. 25, 2011.

54.     All of the foregoing in the aggregate does not contain sufficient information regarding the SyncSort UNIX command language for the development of ssu2scl. Trial Tr. 334:4-334:14, Jan. 21, 2011.

55.     IRI concedes this. IRI's Susan Strickland admitted that she "did a lot of search engines" in order to obtain the abovementioned references to SyncSort UNIX and that, in the aggregate, these items were insufficient to provide information that would permit the development of a translation utility such as ssu2scl. PI Hr'g Tr. 71:8-19, 108:21-109:8, Jan. 5, 2005. IRI did not use any of these materials in the development of ssu2scl. PI Hr'g Tr. 69:16-69:19, Jan. 5, 2005; Pl. Ex. 285 ¶ 18.

56.     In May 2006, Strickland searched the Internet in preparation for her deposition and found a link to a SyncSort UNIX "man page" on a server of the Academic Computing and Communications Center of University of Illinois at Chicago Strickland Dep. 248:16-251:2, May 17, 2006; Pl. Ex. 584 ¶ 22. This man page was an electronic version of the SyncSort UNIX manual applicable to an earlier version of SyncSort UNIX. Pl. Ex. 584 ¶ 20.

57.     The man page was posted on a server that contained computing resources for faculty and staff to aid those university employees using SyncSort UNIX software under the University's license. Trial Tr. 273:21-276:2; Pl. Ex. 553; Pl. Ex. 584 ¶ 19.

58.     There is no evidence that the man page was intended for users other than University employees with the appropriate University-provided ID and password. And there is no evidence that any other competitor of Syncsort has ever accessed this man page or that anyone made competitive use of the man page.

59.     The man page did not disclose information sufficient to develop ssu2scl. *See* Trial Tr. 335:21-336:2, Jan. 21, 2011.

60.     When Strickland revealed the existence of the man page in her deposition Syncsort immediately demanded that the University of Illinois take the man page off of its public web site, which it did. Pl. Ex. 584 ¶ 21.

61.     In early August 2010, the SyncSort UNIX Reference Guide was posted on a Korean website. Trial Tr. 588:21-589:10, May 12, 2011. Syncsort discovered the posting as a result of its recently implemented Internet searches for postings of its proprietary information. Trial Tr. 585:25-586:4, May 12, 2011. During the same timeframe IRI also discovered the same posting. Trial Tr. 540:24-541:19, May 11. 2011. IRI found the Reference Guide by using the Google search "Syncsort_Unix_reference_guide." Trial Tr. 540:24-541:19, May 11, 2011.

62.     After Syncsort became aware that the copy of the Reference Guide was posted on the Internet in Korea, Syncsort sent a cease and desist notice to the host of the Korean website. On August 19, 2010, that Reference Guide was removed from the Internet. Trial Tr. 586:17-587:3, May 12, 2011. There has been no evidence presented that anyone besides Syncsort or IRI obtained or used a copy of this Reference Guide as a result of this posting.

63.     Syncsort's Japanese reseller, K. K. Ashisuto, posted a Japanese language copy of the Reference Guide on its FTP server to provide support to its SyncSort UNIX customers. Miyamoto Dep. 19:13-19:16, May 8, 2011; Pl. Ex. 711. The only direct link to the Japanese Reference Guide was through K. K. Ashisuto's customer support page. Miyamoto Dep. 20:2-20:9, 21:12-21:18, May 8, 2011; Pl. Ex. 705.

64.     All material text contained in the Japanese Reference Guide was in Japanese, other than the keywords of the SyncSort UNIX command language, the words Syncsort and

SyncSort and the names of a handful of other computer or software products. The grammar definitions of the SyncSort UNIX command language are in Japanese, including the nonterminals included in these definitions and the descriptions of language meaning and semantics. Stipulation ¶ 6, June 3, 2011; Miyamoto Dep. 67:12-68:6, May 8, 2011.

65.    It was possible for the Japanese Reference Guide to be located through a Google search. On August 18, 2010, a "Googlebot" or "indexer" first downloaded the Japanese Reference Guide to index it for use in the Google search engine. After that, a Google search could have potentially located the Japanese Reference Guide. Stipulation ¶ 4, June 3, 2011.

66.    There is no direct evidence that anyone accessed the Japanese Reference Guide by Google search before December 2010, when IRI's expert, Professor Michael Shamos, located the Japanese Reference Guide by "hunting around on the Internet for SyncSort Unix materials" in preparation for trial. Trial Tr. 253:21-254:1, Jan. 21, 2011. Shamos was able to find the Japanese Reference Guide through use of a Google search that included "keywords that [he] believed to be unique to SyncSort Unix." Trial Tr. 253:15-254:15, Jan. 21, 2011.

67.    When Syncsort learned, in January 2011, about the availability of the Japanese Reference Guide, it took immediate action to have it removed. K. K. Ashisuto removed it shortly afterward. Trial Tr. 483:13-483:21, May 10, 2011.

68.    There is no evidence that any competitor or unauthorized party downloaded the Japanese Reference Guide. K. K. Ashisuto analyzed its FTP server log and identified all instances in which the Japanese Reference Guide was downloaded. Pl. Ex. 708. A significant number of those who downloaded the Japanese Reference Guide were customers authorized to do so. Pl. Ex. 709; Miyamoto Dep. 40:6-40:19, May 8, 2011; Pl. Ex.713; Trial Tr. 526:25-527:12, May 11, 2011. Among non-customers who downloaded the Japanese Reference Guide

were those involved with this lawsuit and search engine "indexers." Stipulation ¶¶ 1, 4, June 3,

2011. There were also a number of downloads by users who accessed the server from Internet

addresses other than the corporate addresses of licensees, such as Internet Service Providers'

addresses. Stipulation ¶ 3, June 3, 2011.


## CONCLUSIONS OF LAW

Syncsort charges that IRI is liable for trade secret misappropriation and unfair

competition and seeks injunctive relief.

### A.  Trade Secret Misappropriation

"A trade secret claim in the federal courts is governed not by federal common law but by

state law." *Rohm & Haas Co. v. Adco Chem. Co.*, 689 F.2d 424, 429 (3d Cir.1982). The six basic

elements of a claim of trade secret misappropriation in New Jersey are: (1) a trade secret exists;

(2) it was communicated in confidence; (3) the secret information was disclosed in breach of that

confidence; (4) the secret information was acquired by the competitor with knowledge of the

breach of confidence; (5) the secret information was used by the competitor to the detriment of

the plaintiff; and (6) the plaintiff took precautions to maintain the secrecy of the trade secret. *See*

*Merckle GmbH v. Johnson & Johnson*, 961 F.Supp. 721, 727-31 (D.N.J.1997).

#### 1.   Secrecy of the Command Language

##### a. Legal Standard

IRI primarily challenges two elements of the misappropriation claim: (1) the existence of

a trade secret and (2) that Syncsort did not take precautions to maintain the secrecy of the trade

secret. These two elements essentially rest on the same key proposition-"secrecy." *See Darsyn*

*Labs. Inc. v. Lenox Labs., Inc.*, 120 F.Supp. 42, 54 (D.N.J.1954) ("the right to protection begins and ends with the life of secrecy.").

The party who asserts the trade secret bears the burden of proving that the information is a secret and not a matter of general knowledge in the industry. *Rohm & Haas*, 689 F.2d at 431. New Jersey has adopted the definition of trade secret provided in the Restatement of Torts:

> A trade secret may consist of any, formula, pattern, device or compilation of information which is used in one's business and which gives him an opportunity to obtain an advantage over competitors who do not know or use it.

*Id.* (quoting Restatement of Torts, § 757 comment b (1939)). The New Jersey Supreme Court has noted six supplementary considerations given in the Restatement:

> (1) the extent to which the information is known outside the business; (2) the extent to which it is known by employees and others involved in the business; (3) the extent of measures taken by the owner to guard secrecy of the information; (4) the value of the information to the business and to its competitors; (5) the amount of effort or money expended on developing the information; and (6) the ease of difficulty with which the information could be properly acquired or duplicated by others.

*Ingersoll-Rand Co. v. Ciavatta*, 110 N.J. 609, 637, 542 A.2d 879 (1988) (quoting Restatement of Torts, § 757 comment b).

In order to determine whether the "secrecy" of a trade secret has been maintained, the Restatement instructs:

> Matters of public knowledge or of general knowledge in an industry cannot be appropriated by one as his secret. Matters which are completely disclosed by the goods which one markets cannot be his secret. Substantially, a trade secret is known only in the particular business in which it is used. It is not requisite that only the proprietor of the business know it. He may, without losing his protection, communicate it to employees involved it its use. He

> may likewise communicate it to others pledged to secrecy. Others may also know of it independently, as, for example, when they have discovered the process or formula by independent invention and are keeping it secret. Nevertheless, a substantial element of secrecy must exist, so that, except by the use of improper means, there would be difficulty in acquiring the information.

*Merckle GmbH*, 961 F.Supp. at 731 (quoting Restatement of Torts, § 757, comment b).

However, "[t]he secrecy in which a purported trade secret is shrouded need not be absolute." *Id.*; *see also Sun Dial Corp. v. Rideout*, 29 N.J. Super. 361, 368 (App. Div. 1954) ("Absolute secrecy is not required, but rather that qualified secrecy which arises from mutual understanding and is required alike by good faith and good morals."). The owner of the secret is merely required to take "reasonable" precautions to guard the secrecy of the secret. *Id.*

### b.  Analysis

IRI's main argument is that SyncSort UNIX command language should not be afforded trade secret protection because the language has been widely and publicly displayed and that Syncsort has not taken adequate steps to protect its secrecy. IRI points to several public disclosures on the Internet and in publications that, it says, when added together revealed the command language and negated any trade secret status.

Syncsort's response is that these limited disclosures are insufficient to negate the trade secrecy status of the language. Syncsort says that only small portions of the language were disclosed at a time and that some disclosures were inadvertent.  Syncsort also argues that disclosure on the Internet does not necessarily destroy the secret if the disclosure is limited and does not make the information generally known.  Syncsort also points to protections it employed to protect the secrecy of the language, including: licensing agreements, confidentiality legends in the Reference Guide, confidentiality agreements with employees, confidentiality provisions in agreements with distributors, keeping the supply of the program under lock and key, maintaining

tight access controls on computers where the program was developed, and contractual prohibitions against reverse engineering and dissemination of information related to the SyncSort UNIX command language.

"Widespread, anonymous publication of the information over the Internet may destroy its status as a trade secret." *DVD Copy Control Ass'n, Inc. v. Bunner*, 116 Cal. App. 4th 241, 251 (Cal. App. 6th Dist. 2004) (citation omitted). Information "in the public domain cannot be removed . . . under the guise of trade secret protection." *Id.* at 255 (citation omitted). But, publication on the Internet may not destroy a secret if it is "sufficiently obscure or transient or otherwise limited so that it does not become generally known to the relevant people, i.e., potential competitors or other persons to whom the information would have some economic value." *Id.* at 251. The guiding "concern is whether the information has retained its value to the creator in spite of the publication." *Id.* (citation omitted).

The command language appeared on the internet in two primary forms: partial postings (e.g., the "man pages") and the entire SyncSort UNIX Reference Guide which contains the entirety of what Syncsort claims is a trade secret.

### i.   Partial postings.

In the course of their use of SyncSort UNIX, licensees posted on the Internet parts of the SyncSort UNIX command language. In one case, a university posted "manual pages" which contained parts of the command language. In other cases, licensees have posted parts of the language on Internet help forum websites to request assistance with problems. In some cases, Syncsort personnel responded to those requests for help by posting part of the language themselves.

As explained earlier, even if bits and pieces of the command language are publicly available, that does not necessarily negate trade secrecy if those pieces did not provide enough information to be useful to IRI in creating its translator.

Even if Syncsort employees themselves were involved in the posting, this does not eliminate secret status because only minimal portions of the command language were posted. A case in Delaware Chancery Court is illustrative. *Data General Corp. v. Digital Computer Controls, Inc.*, 357 A.2d 105, 110 (Del. Ch. 1975). *Data General* involved a minicomputer manufacturer that made technical documents related to its minicomputers, including a user and a maintenance manual, generally available. Because the documents did "not contain sufficient logic design of the [plaintiff's minicomputer] to permit their being successfully used for the purpose of either duplicating such machine or in assembling a computer substantially identical to the [plaintiff's minicomputer]," the information needed to duplicate the computers remained a trade secret. *Data General*, 357 A.2d at 110. The court contrasted these documents to the plaintiff's logic diagram, which could be used to engineer a competing minicomputer, but bore "a legend . . . clearly stating that such drawings are not to be used for manufacture or sale of the items disclosed without written permission," and thus still remained a trade secret. *Id.* at 110-11.

As in *Data General*, the public posting of parts of the command language did not destroy the trade secret because the information contained in those posting was insufficient to develop the translator.

### ii.      Brief posting of all of the trade secret.

On at least two occasions, an entire copy of the SyncSort UNIX Reference Guide was posted on the Internet, once each in Korea and Japan. These Guides could be used to develop IRI's ssu2scl translator. However, these posts were "sufficiently obscure or transient or

otherwise limited" so that it was not made "generally known to the relevant people" (like potential competitors). *DVD Copy Control Ass'n,* 116 Cal. App. 4th at 251.

In a similar California case, *Silicon Image, Inc. v. Analogix Semiconductor, Inc.*, Civ. No. 07-00635, 2007 U.S. Dist. LEXIS 96073 (N.D. Cal. Jan. 17, 2008), the defendant accessed the trade secret information on a Chinese website.

Following the guidance in *DVD Copy Control Ass'n*, the court concluded that posts on the Chinese website did not destroy the secrecy of the information at issue, *Silicon Image*, 2007 U.S. Dist. LEXIS 96073, at *46, because there was "no evidence, that these postings were 'generally known to the relevant people.'" *Id. at* *45.

IRI can only to these two isolated incidents (Korea and Japan) in which information sufficient to develop the ssu2scl translator was In all three cases the information was quickly removed upon discovery and there is no evidence that information became widely available or that competitors or other unauthorized persons accessed or even attempted to access the information.

### iii.      Measures to protect the trade secret

Here, Syncsort put in place precautions to ensure that no Syncsort employee, agent or customer would disseminate information relating to the command language, such as the SyncSort UNIX Reference Guide, except to those individuals who had signed license agreements or who were otherwise obligated to keep the information confidential. These measures are described in the fact findings.

These are sufficiently reasonable precautions to protect the confidentiality of information related to SyncSort UNIX. IRI has not offered any substantial evidence to suggest that Syncsort's precautions are generally insufficient.

iv.     **Distribution of the Reference Guide to Licensed Users Did Not Negate**

IRI argues that it is not in Syncsort's business interest to keep the command language a secret and that tens of thousands of users know the language so that they can use Syncsort's software.

Distribution of the Reference Guide to many users, even many thousands of them, does not necessarily negate trade secrecy status of the information contained in the guide. That a trade secret owner distributes secret materials outside of his business, but only does so through agreements that require confidentiality, does not destroy the secrecy of those materials, but rather reinforces it. *Fabkom, Inc. v. R.W. Smith & Assocs., Inc.*, Civ. No. 95-4552, 1996 WL 531873, at *7 (S.D.N.Y. Sept. 19, 1996).

Courts have generally concluded that a company may distribute trade secret information without negating the secrecy of the information if it takes appropriate measures to protect the information including non-disclosure agreements and confidentiality legends. As one commentator noted:

> A trade secret may be disclosed to others without losing its protected status, as long as the persons to whom it is disclosed agree that they will not themselves disclose it. This principle has the absurd implication that something can be a secret even if everyone knows it, much like in the story of the Emperor's New Clothes. This fiction nevertheless forms the basis in commerce for trade secrets, since, without it, the first disclosure would destroy the protected status of the secret.

Thomas M.S. Hemnes, *Restraints on Alienation, Equitable Servitudes, and the Feudal Nature of Computer Software Licensing*, 71 Denv. U.L. Rev. 577, 579 (1994) (footnotes omitted).

There are a number of cases involving widespread distribution of materials to a controlled audience, in which courts concluded that the trade secret remained intact. In *Data General Corp. v. Digital Computer Controls, Inc.*, 357 A.2d 105 (Del. Ch. 1975), Data General distributed design drawings to customers for use in maintaining its minicomputer system. Although the drawings contained sufficient information to enable a competitor to design a competing system, the information remained a trade secret because the documents noted that they were not to be used for manufacturing purposes and not disclosed without permission. *See generally Data General Corp.*, 357 A.2d 105. The defendant estimated that as many as 6,000 people outside the plaintiff's company had access to the secret information, nevertheless, the court concluded that the "dissemination is not significant if in confidence." *Id.* at 108 n.5 (citations omitted). Since customers were required to sign a non-disclosure agreement, which stated "drawings are not to be used for manufacture or sale of the items disclosed without written permission," and included confidentiality legends on the manuals themselves, *id.* at 110, the plaintiff's measures were adequate to maintain its trade secrets. *Accord Unix Sys. Labs. v. Berkeley Software Design*, Civ. No. 92-1667 1993 U.S. Dist. LEXIS 19505, at *47 (D.N.J. Mar. 3, 1993) (Debevoise, J.) ("Plaintiff argues that these programs contain a variety of materials that Defendants could have obtained only from proprietary sources, sources subject to contractual guarantees against redistribution. If so, then Plaintiff has not lost its secrets. Trade secrets need not actually be secret, as long as the owner of the secrets controls their dissemination. For example, the owner may disclose it to employees or to others pledged to secrecy."); c*f. Board of Trade v. Christie Grain & Stock Co.*, 198 U.S. 236, 250-51 (1905) (Holmes, J.) (Plaintiff's "collection of quotations . . . stands like a trade secret. . . . The plaintiff does not lose its rights by communicating the result to persons, even if many, in confidential relations to itself, under a

28

contract not to make it public, and strangers to the trust will be restrained from getting at the knowledge by inducing a breach of trust and using knowledge obtained by such a breach.") (citations omitted).

Here, Syncsort has taken the same basic measures that other courts consider reasonable. It requires all licensees and employees to sign non-disclosure agreements (which are described earlier) and it includes a "proprietary and confidential material" notice at the front the SyncSort UNIX Reference Guide. Pl. Ex. 114, at 2. It is "standard industry practice to market software through licensing agreements that impose confidentiality obligations on customers." *Fabkom*, 1996 WL 531873, at *13. And as "a participant in the software development market" could be deemed to "have been aware at least of a high probability that there was a confidentiality agreement protecting" the software. *Id.*; *see also Data General. Corp. v. Grumman Sys. Support Corp.*, 825 F. Supp. 340, 359 (D. Mass. 1993) ("Heroic measures" are not required to preserve the secrecy of a trade secret; instead the measures taken by Data General, primarily confidentiality agreements with its customers and employees, as well as notices on written materials, were reasonable to protect the secrecy of the information.), *ISC-Bunker Ramo Corp. v. Altech, Inc.*, 765 F. Supp. 1310, 1334 (N.D. Ill. 1990) (disclosures of a trade secret to those under confidentiality obligations does not impact the status of the trade secrets); *Trandes Corp. v. Guy F. Atkinson Co.*, 996 F.2d 655, 664 (4th Cir. 1993) (same).

## 2. Remaining Parts of the Restatement Test

### a. The Value of the SyncSort UNIX Command Language

The SyncSort UNIX command language, as embodied in the Reference Guide, gives Syncsort a competitive advantage and is valuable. The command language is necessary to the

operation of the software, without the language, users would not be able to complete data transformation tasks.

    **b.**  **Syncsort Expended a Significant Sum to Develop the Command Language**

Syncsort spent roughly $13 million and over a decade to develop SyncSort UNIX and the command language. The result was the software and a nearly 400-page manual describing the language.

    **c.**  **It Was Difficult for IRI to Properly Acquire and Duplicate Syncsort's Command Language**

Acquiring enough information to convert SyncSort UNIX scripts was difficult: Initially IRI collected job-control scripts from SyncSort UNIX licensees, but this was not enough. Instead, IRI was only able to create ssu2scl after it copied directly from Syncsort's proprietary Reference Guide. IRI did not rely upon public sources of information to develop, but instead (as Syncsort puts it) "relied solely on the Reference Guide and on the scripts in the command language created by Syncsort's licensees. Acquiring information from those who have agreed to keep it confidential is not a 'proper' method of acquisition . . . it is apparent that commercially useful information about the SyncSort UNIX command language could not, even with difficulty, be 'properly' acquired by others." Syncsort Prop. Concl. of Law ¶ 172 (citations omitted)

    **3.** **Remaining Elements of Trade Secret Misappropriation**

Syncsort must also prove the remaining for elements (by establishing secrecy, it met the first and sixth requirements). The remaining elements are whether: (1) the trade secret was communicated in confidence; (2) the secret information was disclosed in breach of that confidence; (3) the secret information was acquired by the competitor with knowledge of the

breach of confidence; (4) the secret information was used by the competitor to the detriment of the plaintiff.

Syncsort easily meets the first and second questions. As described in the factual findings, Syncsort distributed its trade secret information via the Reference Guide and required licensees to sign non-disclosure agreement. IRI obtained its copy of the Reference Guide, not from some public source, but from a source in Brazil that more likely than not obtained the document either as licensee itself or from another licensee. In either case, in all probability, the ultimate source of the Reference Guide was someone who obtained under a non-disclosure agreement. The weight of the evidence also supports the conclusion that IRI knew that it received the Reference Guide in breach of confidence. The Reference Guide itself begins with the confidentiality notice. And, as is common in the industry, the manual for CoSort, IRI's software, also includes a similar confidentiality notice. It is "standard industry practice to market software through licensing agreements that impose confidentiality obligations on customers," *Fabkom*, 1996 U.S. Dist. LEXIS 13686, at *37. And as "a participant in the software development market" IRI in all probability was "aware at least of a high probability that there was a confidentiality agreement protecting" the software. *Id.* at *38.

The evidence shows that IRI used the ssu2scl translator to Syncsort's detriment. IRI actively offered the translator as a resource for Syncsort customers that sought to switch to IRI. The translator was designed for one purpose: to convert SyncSort UNIX scripts to the command language for CoSort. The only reason for the translation capabilities is to ensure a smooth transition to CoSort for departing SyncSort UNIX customers.

The Court finds that Syncsort has clearly demonstrated by the required preponderance of believable evidence that the SyncSort UNIX command language is a trade secret. And the Court

further finds that IRI knowingly misappropriated this trade secret in the use of a copy of the

Reference Guide obtained from Brazil and job-control scripts.

### B.  IRI is Liable for Unfair Competition

For the same substantive reasons that IRI is liable to Syncsort for misappropriation of trade

secrets, IRI is liable for unfair competition. *See Hoffman-La Roche Inc. v.Genpharm Inc.*, 50 F.

Supp. 2d 367, 380-81 (D.N.J. 1999) (Walls, J.) (misappropriation of a

trade secret constitutes unfair competition under New Jersey law).

### C.  Injunctive Relief

When assessing the merits of a request for injunctive relief in a diversity of citizenship

action, federal courts generally will apply state law. 13 Moore's Federal Practice - Civil § 65.07;

28 U.S.C. § 1652 ("The laws of the several states, except where the Constitution or treaties of the

United States or Acts of Congress otherwise require or provide, shall be regarded as rules of

decision in civil actions in the courts of the United States, in cases where they apply.").

To obtain a permanent injunction, New Jersey relies upon "proof that the applicant's

legal right to such relief has been established and that the injunction is necessary to prevent a

continuing, irreparable injury."  *Verna v. Links at Valleybrook Neighborhood Ass'n*, 371 N.J.

Super. 77, 89 (App. Div. 2004). Such is demonstrated by the factors found in the Restatement

(Second) of Torts:

> (1) the character of the interest to be protected; (2) the relative
> adequacy of the injunction to the plaintiff as compared with other
> remedies; (3) the unreasonable delay in bringing suit; (4) any
> related misconduct by plaintiff; (5) the comparison of hardship to
> plaintiff if relief is denied, and hardship to defendant if relief is
> granted; (6) the interests of others, including the public; and (7) the
> practicality of framing the order or judgment

*Sheppard v. Township of Frankford*, 617 A.2d 666, 669 (N.J. App. Div. 1992) (quoting Restatement (Second) of Torts § 936 (1977)).

### 1.   Syncsort's Property Interest Is of a Character That Should be Protected

Syncsort's property interest in its trade secret is worthy of protection. Courts have not hesitated to enjoin competitors from using trade secrets. *See, e.g.*, *Rohm & Haas*, 689 F.2d at 433.

### 2.   Money Damages Are Inadequate

Money damages are inadequate because IRI's misappropriation is continuing, irreparable harm. The sole purpose of the ssu2scl translator is to lure Syncsort's customers, if IRI is not enjoined from use of Syncsort's trade secret, it will, in all likelihood continue to use Syncsort's proprietary information to compete against Syncsort. Even if a damage award were available in this case and damages were presently ascertainable, a monetary award would not adequate compensate for future lost goodwill and commercial profits. Moreover, the nature of trade secrets demand injunctive relief: if IRI is permitted to continue using the proprietary information, the information may no longer be considered secret and once lost, a trade secret is lost forever. It would be difficult to quantify the extent of the loss of secrecy status.

### 3.   Syncsort Promptly Sued IRI

Syncsort sued IRI within four months of learning of the misappropriation. There was no delay, nor have the defendants suggested that there was.

### 4.   There is No Evidence of Misconduct by Syncsort

There is no evidence that Syncsort has unclean hands in this matter.

### 5.  The Balance of Hardships Favors Syncsort

As discussed, without an injunction, Syncsort will likely continue to face the prospect of lost customers and continued misappropriation of its trade secrets. Even if IRI claimed hardship from an injunction (it is not clear that it does), those claims are illegitimate as Syncsort only seeks an injunction against IRI's law-breaking. *See York Intern. Corp., IMECO, LLC v. York Hvac Systems Corp.*, Civ. No. 09-3546, 2010 WL 1492851, at *4 (D.N.J. Apr. 14, 2010) (Walls, J.) (although they may suffer "some economic losses" if unable to use the disputed mark, they "can hardly claim to be harmed, since they brought any and all difficulties occasioned by the issuance of an injunction upon themselves") (citation and brackets omitted).

### 6.  The Public Interest Favors Syncsort

IRI argues that an injunction in this case would harm the public interest, specifically Syncsort's current licensees, because it would restrict the use of job control scripts by Syncsort's customers. IRI argues that these scripts are a licensee's intellectual property and that the licensees never agreed to limit the use of the job control scripts.

IRI's argument is misplaced. SyncSort UNIX licensees sign an agreement in which they promise not to "disclose any information related to the Software." Pl. Ex. 441 ¶ 4. Software id designed not only the computer software, but also includes "any printed documentation and materials, and any 'on-line' or electronic documentation provided by Syncsort related to such software." Pl. Ex. 441 preamble. This definition includes the SyncSort UNIX Reference Guide, which documentation related to the software. The information contained in job control scripts necessarily includes parts of the command language taken from the SyncSort UNIX Reference Guide. It follows that the job control scripts contain at least some proprietary information, which

licensees have agreed not to disclose. There is no harm to them by prohibiting IRI from inducing licensees to breach the licensing agreements.

### 7.   There Is No Impractically to Issuing the Order Granting Injunctive Relief

Injunctive relief here requires an order that IRI will cease from using Syncsort's trade secrets, specifically in the form of a translator and use of proprietary knowledge gained from job control scripts and the SyncSort UNIX Reference Guide. IRI points to no reason why it would be impractical to issue such a specific order or administering it.

### CONCLUSION

IRI misappropriated Syncsort's proprietary trade secret and engaged in unfair competition through its use of the SyncSort UNIX Reference Guide and SyncSort UNIX licensees' job control scripts to create and fine tune IRI's ability to translate the SyncSort UNIX command language to the CoSort command language. Syncsort is entitled to injunctive relief.

### ORDER

It is ORDERED that defendant, its officers, directors, agents, servants, employees and all persons in active concert or participation with any of them are permanently restrained and enjoined from:

1.   using, marketing, selling or distributing the software utilities known as "ssu2scl" and "rescript" or any other software that includes the capabilities of interpreting, parsing or translating job control scripts in the SyncSort UNIX command language;

2.   accessing or using any non-publicly available information derived from plaintiff's software products, including associated printed documentation and materials, including, without limitation, any version of the SyncSort UNIX Reference Guide and any job control scripts written in the SyncSort UNIX language;

3.   soliciting or accepting non-publicly available copies of SyncSort UNIX job control scripts from any person;

4.  making any reference to ssu2scl or rescript in any website, advertising or marketing materials;

5.  making any reference to the ability to translate SyncSort UNIX job control scripts into any other command language or job control parameters, including without limitation SortCL, in any website, advertising or marketing materials; and

6.  inducing any Syncsort customer to disclose to any of them, or accepting from any Syncsort customer, information regarding plaintiff's software products, including associated printed documentation and materials or any SyncSort UNIX job control script.

It is ORDERED that defendant, its officers, directors, agents, servants, employees and

attorneys, and all persons in active concert or participation with any of them:

1.  destroy all copies in their possession or under their control, whether located within the United States or abroad, of ssu2scl and rescript and all source code and documentation related thereto;

2.  destroy all copies in their possession or under their control, whether located within the United States or abroad, of any non-publicly available information derived from plaintiff's software products, including associated printed documentation and materials (including, without limitation, any version of the SyncSort UNIX Reference Guide and any SyncSort UNIX job control scripts); and

3.  provide to plaintiff within 30 days of this order written certification of compliance with paragraphs 1 and 2.

August 18, 2011

**/s/ William H. Walls**
United States Senior District Judge

36